**RS & P/WC FIELDS LIMITED PARTNERSHIP, et al., Plaintiffs,**

**v.**

**BOSP INVESTMENTS and BOMAT Investments, Defendants.**

**No. 91 C 2496.**

United States District Court, N.D. Illinois, E.D.

July 30, 1993.

Stephen Anthony Gorman, Richard G. Schultz, Foran & Schultz, Chicago, IL, Jerome J. Shestack, David Smith, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for plaintiffs.

Neal L. Wolf, Janet Steffes Baer, Laura Ann Mondrowski, Michael P. O'Neil, Winston & Strawn, Chicago, IL, for defendants.

*MEMORANDUM OPINION AND ORDER*

HOLDERMAN, District Judge:

This litigation involves disputes between the general partners (the "plaintiffs") and the limited partners (the "defendants") of several real estate limited partnerships. The plaintiffs have asked the court to interpret the proper calculation methodology for the "buy-sell" provisions of the partnerships (Count I), and they have asked the court to declare that the defendants could not invoke the "buy-sell" provisions in the spring of 1991 (Count III). The defendants have asserted third-party claims and counterclaims to recover allegedly excess management fees ("management fee issue") and allegedly improper accounting fees ("accounting fee issue"). After a bench trial on all issues, for the reasons stated herein, the court finds in favor of the defendants on Count I and III, and in favor of the plaintiffs on defendants' third-party claims and counterclaims as to the management fee issue and accounting fee issue.

## TABLE OF CONTENTS

Page

I. BACKGROUND FACTS ............................................. 931
 A. The Master Agreement ...................................... 933
 B. The Form of Agreement of Limited Partnership ...................... 937
 C. The Form of Management Agreement ............................ 941
 D. The Guaranty Agreement .................................... 946
 E. The Indemnity Agreement ................................... 946
 F. The First Amendment to Master Agreement ....................... 946
 G. The 13 Limited Partnerships ................................. 947
 1. The Parties ........................................... 947
 2. Capital Contributions, Loans and Fees ....................... 949
 3. The Agreements of Limited Partnership ....................... 949
 4. The Management Agreements ............................... 950
 5. Assignment of the Management Agreements .................... 951
 H. The Exercise of Buy–Sell Rights by BOSP and BOMAT ............... 951
 1. The Count I Partnerships ................................. 951
 a. 2120 Corporate Drive Associates Limited Partnership ........... 951
 b. WC West Chicago Associates Limited Partnership .............. 952
 c. TC Associates Limited Partnership ......................... 952
 d. MP Melrose Park Associates Limited Partnership .............. 953
 2. The Count III, Counterclaim and Third Party Partnerships .......... 953
 a. W65 Bedford Park Associates .............................. 953
 b. CG Coral Gables Associates Limited ........................ 953
 c. SW Associates Limited Partnership ......................... 953
 d. 32500 Van Born Associates Limited Partnership ............... 953
 e. 601 West Polk Associates Limited Partnership ................. 953
 f. 32500 Capitol Avenue Associates Limited Partnership ........... 953
 g. WC Fields Limited Partnership ............................ 954
 h. Barnside Apartment Associates Limited Partnership ............ 954
 i. Newtown Associates Limited Partnership .................... 954

Page

 I. Commencement of this Litigation .................................... 954
II. DISCUSSION ......................................................... 955
 A. Count I ......................................................... 955
 1. The Relevant Contract Provisions ............................. 956
 2. Plaintiffs' Ambiguity Theory ................................. 960
 3. Contract Reformation ....................................... 961
 a. Business Reality .......................................... 962
 b. Phantom Income ......................................... 964
 c. Variance in Limited Partnership Agreements ................... 967
 d. Lack of Authority/Failure to Read ............................ 968
 e. Summary .............................................. 969
 B. Count III ....................................................... 969
 1. Existence of a Forbearance Agreement ......................... 970
 a. Burch's consent Re: Grub & Ellis ........................... 970
 b. Negotiation for Amended Barnside Agreement ................. 971
 c. Creditor Memorandum .................................... 971
 d. Burch Memorandum ...................................... 971
 2. Equitable Estoppel .......................................... 972
 C. Management Fees ................................................ 973
 1. Contract Provisions and Correspondence ....................... 974
 2. Unilateral Right Theory ...................................... 977
 3. Existence of an Agreement .................................... 977
 D. Accounting Fees ................................................. 978
 1. Charging Accounting Fees .................................... 979
 2. KTP as a Sheridan Affiliate ................................. 981
 E. The Accounting ................................................. 981
 F. Terminating the Partnerships ..................................... 981
III. CONCLUSION ........................................................ 981

## I. *BACKGROUND FACTS*

The plaintiffs and defendants established 13 limited partnerships, which were formed between April, 1987 and May, 1990, for the purpose of acquiring, developing, owning, operating, and selling commercial real estate properties.

There are 12 plaintiffs in this action: 1) RS & P/WC Fields Limited Partnership ("Fields LP"), an Illinois limited partnership, all of whose partners are citizens of Illinois and Florida; 2) W 65 RS & P Associated Limited Partnership ("W65LP"), an Illinois limited partnership, all of whose partners are citizens of Illinois, New York and Florida; 3) CG RS & P Associates Limited Partnership ("CGLP"), an Illinois limited partnership, all of whose partners are citizens of Illinois and Florida; 4) RS & P/Capitol Avenue Associates Limited Partnership ("Capitol LP"), an Illinois limited partnership, all of whose partners are citizens of Illinois and Florida; 5) WM/RS & P Limited Partnership ("WMLP"), an Illinois limited partnership, all of whose partners are citizens of Illinois, New York and Florida; 6) SW/RS & P Limited Partnership ("SWLP"), an Illinois limited partnership, all of whose partners are citizens of Illinois, New York and Florida; 7) RS & P/Barnside Associates Limited Partnership ("Barnside LP"), an Illinois limited partnership, all of whose partners are citizens of Illinois, New York and Florida; 8) TC/RS & P Limited Partnership ("TCLP"), an Illinois limited partnership, all of whose partners are citizens of Illinois and Florida; 9) RS & P/Addison Associates Limited Partnership ("Addison LP"), an Illinois limited partnership, all of whose partners are citizens of Illinois, New York and Florida; 10) RS & P/Melrose Park Associates Limited Partnership ("Melrose LP"), an Illinois limited partnership, all of whose partners are citizens of Illinois and Florida; 11) RS & P/Polk Associates Limited Partnership ("Polk LP"), an Illinois limited partnership, all of whose partners are citizens of Illinois and Florida; and 12) RS & P/WC West

Chicago Limited Partnership ("West LP"), an Illinois limited partnership, all of whose partners are citizens of Illinois, New York and Florida.

Defendant BOSP Investment ("BOSP") is a California partnership, all of whose partners are citizens of states other than Illinois, New York and Florida.

Defendant BOMAT Investments ("BOMAT") is a Nevada partnership, all of whose partners are citizens of states other than Illinois, New York and Florida.

Third Party Defendant RS & P/Newtown Associates Limited Partnership ("Newtown LP") is a Florida limited partnership, all of whose partners are citizens of Illinois and Florida.

Third Party Defendant Edgemont Corporation ("Edgemont") is an Illinois corporation. At all relevant times, Edgemont has been controlled by Robert Sheridan and 100 percent of the stock of Edgemont has been owned by Robert Sheridan.

Third Party Defendant Robert Sheridan & Partners Management Corporation ("RS & P Management") is an Illinois corporation. At all relevant times, RS & P Management has been controlled by Robert Sheridan and 100 percent of the stock of RS & P Management has been owned by Robert Sheridan.

Third Party Defendant The Bridgewood Corporation ("Bridgewood") is an Illinois corporation. Robert Sheridan owns 45% of the stock of Bridgewood, Robert Sheridan's daughter, Beth Sheridan, owns 15% of the stock, and Bruce Kinney owns the remaining 40% of the stock.

This court has jurisdiction over this matter under 28 U.S.C. § 1332, there being complete diversity of citizenship among the parties and the amount in controversy being in excess of $50,000.

The primary, although not only, dispute concerns the interpretation and application of the "buy-sell" provisions of 13 Agreements of Limited Partnership. Buy-sell provisions are commonplace in partnership agreements. They are a contractual mechanism by which partners may, among other things, resolve disputes and break deadlocks between and among one another. Buy-sell provisions vary from partnership agreement to partnership agreement. In their most simple form, buy-sell provisions permit one partner to make an offer to purchase the partnership interest of the other partner. Often the second partner may then elect either to sell his interest in accordance with the offer or to purchase the interest of the first partner under substantially the same terms and conditions. The timing and conditions of buy-sell rights generally is determined by the agreement of the parties.

In the case of the four Count I partnerships, the parties disagree on how the purchase price is to be calculated pursuant to Article VII of the Agreements of Limited Partnership. In the case of the nine Count III and third party partnerships, the general partner claimed that the limited partner was not entitled to exercise buy-sell rights *at that time.* The Counterclaim and Third Party Complaint in this case raise issues regarding the general partner's management of the real property owned by the respective limited partnerships.

Although this case involves many different partnerships and corporate entities, it really involves two individuals, Robert Sheridan ("Sheridan") and Robert D. Burch ("Burch"). Sheridan is a Chicago, Illinois-based real estate developer and manager. Burch is a tax and trust lawyer in the Los Angeles, California-based law firm of Gibson, Dunn & Crutcher. For a number of years, Burch has served as trustee of a number of investment trusts set up by various members of the Bing family. Burch first met Sheridan in 1985, when, on behalf of certain Bing family trusts, Burch sold some real estate located in New York City to Sheridan. That transaction is not in dispute in this case.

During the Fall and Winter of 1986–87, Sheridan and Burch began to discuss the development of a business relationship under which: (a) Sheridan would locate and assess commercial real estate investment opportunities and recommend appropriate opportunities to Burch; (b) if Burch, acting on behalf of the Bing family interests, chose to invest in such opportunities, the parties would form limited partnerships, wholly or partially

funded by Burch, to acquire, develop, manage, operate, and dispose of the property; and (c) Burch would provide much of the funding and Sheridan would provide his expertise in locating and managing the partnership properties through entities controlled by him.

## A. *THE MASTER AGREEMENT*

The discussions between Sheridan and Burch concerning the creation of an ongoing business relationship culminated, in March of 1987, in the execution of a contract, entitled the "Master Agreement", between Burch, as Trustee or Co–Trustee of certain Bing family trusts, and Edgemont.

The parties to the negotiations were sophisticated and experienced in dealing with matters such as those being negotiated, and were represented by qualified and sophisticated legal counsel. The negotiations concerning the form and content of the Master Agreement were conducted, on behalf of Sheridan and Edgemont, by Sheridan himself, by Stuart Lederer ("Lederer"), an attorney employed by an entity controlled by Sheridan, and by Harvey Uris ("Uris") and Victoria Watson ("Watson") of the New York City-based law firm of Skadden, Arps, Slate, Meagher & Flom ("Skadden Arps"). On behalf of Burch, such negotiations were conducted primarily by Burch himself and Ralph Wintrode ("Wintrode") and Charles Larson ("Larson"), also members of the law firm of Gibson, Dunn & Crutcher. Other attorneys at Gibson, Dunn & Crutcher were involved to a much lesser extent.

The parties agree that neither party to the negotiation was compelled to enter into the Master Agreement by any form of duress or coercion.

The introductory paragraphs of the Master Agreement provided as follows:

WHEREAS, Sheridan has expertise in locating commercial properties for investment, analyzing the investment potential of same, and owning, operating, developing and managing such properties, and is desirous of obtaining an equity commitment in connection with the pursuit of such investment opportunities;

WHEREAS, Burch is desirous of committing certain funds for investment with Sheridan on a joint venture basis in one for more commercial properties to be identified, analyzed and recommended by Sheridan as viable investment opportunities; and

WHEREAS, Sheridan and Burch are mutually desirous of entering into a joint venture program (the "Program"), whereby Sheridan will present to Burch joint venture investment proposals for commercial properties with respect to which Sheridan and one or more of the trusts described in Exhibit A (the "Burch Partner") will enter into separate limited partnerships (each, an "Investment Partnership") for the purpose of jointly acquiring those commercial properties recommended by Sheridan which are approved by Burch, for investment, and thereafter owning, operating, developing and/or disposing of same, all upon the terms and subject to the conditions set forth hereinafter and in the partnership agreements for the individual partnerships.

The Master Agreement contained, among others, provisions:

(a) Committing Burch to invest not less than $5 million in the Program as defined in the Master Agreement (Master Agreement ¶ 1(a));

(b) Establishing investment criteria, or guidelines, with respect to the kind of properties which the parties would attempt to locate and acquire (Master Agreement ¶ 2(a) and Exhibit C);

(c) Obligating Edgemont to use reasonable efforts to locate commercial properties meeting the investment criteria, to analyze the investment potential of such properties, and to prepare and submit to Burch an acquisition proposal with respect to each property which Edgemont deemed appropriate for investment (Master Agreement ¶ 2(b));

(d) Obligating Edgemont to provide Burch with a proposed plan for development of the recommended property, which was defined in the Master Agreement as the "Business Plan":

In addition, Sheridan shall provide to Burch (as part of the Acquisition Proposal) a proposed plan for development of the Recommended Property (the "Business Plan") which shall include an analysis of the investment potential of the Recommended Property and the manner in which the value of, and/or net cash flow from, the Recommended Property is expected to or may be increased or maximized by reason of space lease turnovers, changes in use, upgrading of improvements, changes in market conditions and/or other factors.

(Master Agreement ¶ 2(b)(iii));

(e) Providing that, if Burch decided to accept an acquisition proposal made by Sheridan, the parties would execute an Agreement of Limited Partnership in "substantially the form set forth in Exhibit B" to the Master Agreement. In particular, Section 3 of the Master Agreement provided as follows:

3. *Acceptance of Acquisition Proposal; Formation of Investment Partnership; Confidentiality.*

(a) Sheridan shall submit each acquisition Proposal to Burch promptly after compiling same. Burch shall consider each Acquisition Proposal and may promptly request such additional information as he determines is reasonably necessary to allow him to determine whether or not to invest in the Investment Partnership that will acquire the Recommended Property. If Burch desires to accept the Acquisition proposal, he shall so notify Sheridan and the parties shall promptly finalize and execute a Partnership Agreement to form the Investment Partnership in substantially the form set forth in Exhibit B for the Recommended Property. Burch recognizes that time may be of the essence in many of the proposed acquisitions and will endeavor to respond promptly to each Acquisition Proposal. Sheridan recognizes that the investment decision by Burch necessarily requires an informed exercise of his judgment with respect to each such proposal and that Burch will frequently have other commitments which may prevent his acting on an Acquisition Proposal as promptly as he might wish. Sheridan agrees to provide Burch with as much advance notice as is feasible of the date an Acquisition Proposal will be presented, to provide advance preliminary information concerning the Acquisition Proposal wherever feasible, in each case, to give Burch a time period which is reasonable in light of all relevant circumstances to consider and make a decision as to the Acquisition Proposal.

(b) Each Investment Partnership shall (x) enter into all appropriate contractual documentation required in order to acquire, operate and develop the Recommended Property described in the approved Acquisition Proposal (each Recommended Property, when so approved, being referred to herein as an "Approved Property") and (y) pay (from capital contributions and/or interim loans made thereto), to the extent and at the times set forth in the Budget, all required down payments, portions of the purchase price (if applicable), Approved Expenses and all other costs and expenses to be incurred with respect to such Approved Property. Among other matter, the Partnership Agreement shall be consistent with the following:

(i) The initial Budget and Business Plan appearing in the approved Acquisition Proposal and annexed as Schedules to such Partnership Agreement may not be materially amended without the consent of the Burch Partner (provided that changes to individual line items of the Budget shall not be deemed material amendments unless such changes in the aggregate result in a material increase in the total anticipated costs and expenses of the Investment Partnership as set forth in the Budget or a material change in the manner in which the Approved Property will be operated or developed).

(ii) With respect to each Investment Partnership entered into, the Burch Partner shall be entitled to received a Preferred Return (such capitalized term, and each other capitalized term not otherwise defined in this subparagraph 3(b), shall have the meaning ascribed thereto by the Partnership Agreement) at the

rate of ten percent (10%) per annum (compounded annually in arrears) on a cumulative basis to the extent of Distributable Cash and on a priority basis from Proceeds from a Capital Transaction.

(iii) Each Investment Partnership will contain additional provisions comparable to those set forth in Exhibit B, the general intended effect of which is that thereafter, Distributable cash will be distributed fifty (50%) percent to Sheridan and fifty (50%) percent to the Burch partner. In the case of Proceeds from a Capital Transaction, after distribution to the Burch Partner of the Preferred Return for the applicable Investment Partnership, and recovery by the Burch Partner of its Unrecovered Capital, the balance of such Proceeds from a Capital Transaction will be distributed fifty (50%) percent to Sheridan and fifty (50%) percent to the Burch Partner. To the extend that any additional limited partners participate in any Investment Partnership, the Burch Partner and such other limited partners shall share all distributions in the ratio of their respective Investment Participation.

(c) If Burch rejects an Acquisition Proposal or does not accept an Acquisition Proposal within a reasonable period of time, Burch shall have no right to participate in the acquisition of the Recommended Property covered thereby, and Sheridan shall thereafter upon written notice to Burch be free to acquire the Recommended Property for its own account or with participants or investors other than Burch.

(d) Subject to such disclosures as are reasonably necessary to Burch's investigations of a Proposal, Burch agrees to keep confidential all information and materials that are supplied to him in accordance with the terms and provisions of this Agreement including, without limitation, any and all information set forth in any Acquisition Proposal delivered to Burch pursuant hereto.

(Master Agreement ¶ 3);

(f) Providing a minimum return to the Burch entities, Section 4(a) of the Master Agreement provided as follows:

4. *Minimum Investment Return.*

Supplementing the provisions of the various Partnership Agreements relating to the Preferred Return for each Investment Partnership, Sheridan agrees that it will not be entitled to receive any return from any Investment Partnership until the Burch Partner of each Investment Partnership has received a cumulative preferred yield of at least eight percent (8%) per annum (compounded annually in arrears). It is not intended that the Subsidy Payments and repayments thereof under this Section 4 effect amounts otherwise payable to partners other than Burch and Sheridan. In order to implement this it is specifically agreed that:

(a) If at any time there is Distributable Cash or Proceeds from a Capital Transaction (collectively "Available Cash Proceeds") from an Investment Partnership in excess of the Preferred Return but there are one or more other Investment Partnerships where the Burch Partner has not received a cumulative preferred yield of at least eight percent (8%) per annum (compounded annually in arrears) (each a "Subsidized Partnership"), the next Available Cash Proceeds otherwise payable to the Partners in excess of the Burch Partner's Preferred Return shall be paid instead pro rata to the Burch Partner(s), in each such Subsidized Partnership (each such payment a "Subsidy Payment") until each such Burch Partner has received a cumulative preferred yield of eight percent (8%) per annum (compounded annually in arrears). Any additional amounts of Available Cash Proceeds from such other Investment Partnership(s) making a Subsidy Payment shall be paid in accordance with the Partnership Agreement(s) for such Investment Partnership(s) making a Subsidy Payment and this Agreement. All Subsidy Payments provided in this Section 4(a) shall be made from Investment Partnership(s) designated by Burch. Subsidy Payments made under this Section 4(a) shall be repaid before any Subsidy Payments under Section 4(c).

(Master Agreement ¶ 4(a)).

(g) Entitling Edgemont to reimbursement of its actual out-of-pocket costs and expenses

incurred in connection with the preparation of an acquisition proposal and acquisition or attempted acquisition of a targeted property (Master Agreement ¶ 5(a));

(h) Entitling Edgemont to receive an acquisition fee at the closing of the acquisition by a particular partnership of an approved property, stating that the acquisition fee would be calculated as a percentage of the total purchase price, and establishing a schedule for the determination of such acquisition fee:

(i) two and one-half (2–½%) percent of all or any portion of the total purchase price up to the first Ten Million ($10,000,-000) Dollars thereof;

(ii) two (2%) percent of the portion of the total purchase price, if any, in excess of Ten Million ($10,000,000) Dollars and up to Twenty Million ($20,000,000) Dollars;

(iii) one and one-half (1–½%) percent of the portion of the total purchase price, if any, in excess of Twenty Million ($20,000,-000) Dollars and up to Thirty Million ($30,-000,000) Dollars; and

(iv) one (1%) percent of the portion of the total purchase price, if any, in excess of Thirty Million ($30,000,000) Dollars.

(Master Agreement ¶ 5(b)).

The parties contemplated that each limited partnership would enter into a contract with a corporation controlled by Sheridan under which the latter would provide management services concerning the real property owned by the partnership for a management fee. The Master Agreement at Section 7 specifically provided:

7. *Management Agreement.*

Promptly after the formation thereof pursuant to the provisions of this Agreement, each Investment Partnership shall enter into a management agreement (a "Management Agreement") between each such Investment Partnership, as owner, and Sheridan (or its affiliate or designee), as managing agent in the form annexed hereto as Exhibit D and made a part hereof, pursuant to the terms of which Sheridan (or its approved affiliate) shall manage and operate each Approved Property on behalf of the acquiring Investment Part-

nership. Sheridan (or its approved affiliate or approved designee), as the managing agent, shall be entitled to receive a management fee (the "Management Fee") in an amount which the parties contemplate shall approximate its costs in managing the property. Except as the parties may from time to time agree in order to better coordinate the fee with Sheridan's costs, responsibilities and/or the results achieved, the fee shall be equal to three (3%) percent of the annual collected gross income from each Approved Property. Said Management Agreement may also provide for leasing fees to Sheridan (in addition to commissions and fees paid to outside brokers) in an amount not to exceed 25% of the commission payable to outside brokers for new leases and for renewal leases under 50,000 square feet, which leasing fees are intended to be used primarily to provide incentive compensation to the Managers's employees responsible for leasing and renewing leases. Leasing commissions, if any, for renewal leases over 50,000 square feet shall be subject to agreement by both parties. It is understood and agreed that income from all sources is to be included in the calculation of collected gross income for purposes of calculating the amount of the Management Fee, provided, however, that with respect to properties which are leased to tenants on a net lease basis, the revenues from such net leases will be equitably adjusted and increased where appropriate for purposes of calculating the applicable Management Fees, which fees are intended to be based on an amount of collected gross income that reflects the amount of the rentals which would have been paid if such net lease had been written on a "gross lease" rather than a "net lease" basis, pursuant to which the tenant would pay to the Investment Partnership its pro rata share of real estate and other applicable tax increases over the initial lease year, together with energy, maintenance and other applicable charges.

The Master Agreement also provided, at Section 10, as follows:

10. *Miscellaneous*

(a) This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois.

(b) Sheridan and Burch each agree to execute, acknowledge and deliver or cause to be delivered such other documents as may be reasonably necessary and required from time to time in order to confirm the provisions of this Agreement and the performance of the obligations of the parties hereto in such form as shall be reasonably satisfactory to the parties hereto.

(c) This Agreement, including the Exhibits annexed hereto, contains the entire Agreement among the parties hereto with respect to the subject hereof and supersedes all prior agreements, understandings, discussions, negotiations and representations, if any, with respect thereto. In the event of any conflict between the provisions of this Agreement and the provisions of any Partnership Agreement for any Investment Partnership, the provisions of this Agreement shall control.

(d) If any terms or provisions of this Agreement are determined to be unenforceable, the remainder of this Agreement and any other application thereof shall not be affected thereby.

(e) This' Agreement may not be modified, terminated or amended, nor any of its provisions waived, except by a written instrument signed by the party to be charged.

(f) The provisions of this Agreement shall be binding upon, and shall inure to the benefit of, each of the parties hereto and its respective heirs, legal representatives, successors and assigns.

(g) Neither of the parties hereto may assign any of its interests under this Agreement, and the interests of Robert Sheridan in Sheridan or in the General Partner of Sheridan may not be transferred or assigned without the prior written consent of the other party, unless said transfer results in Robert Sheridan having or continuing to have a 51% interest in Sheridan or General Partner of Sheridan or any assignee in which case Burch's consent shall not be required. Sheridan agrees to promptly advise Burch of any transfer or assignment of the interests in Sheridan or the General Partner of Sheridan not otherwise requiring the consent of Burch hereunder including the identity of the transferee.

## B. THE FORM OF AGREEMENT OF LIMITED PARTNERSHIP

The Master Agreement contained a form of Agreement of Limited Partnership which the parties agreed would be "promptly finalized and executed" if, as, and when they agreed to enter into a limited partnership for the purpose of acquiring and operating certain commercial real property. (Master Agreement ¶ 3(a)). This form of agreement, which was attached to the Master Agreement as Exhibit B, was also the subject of negotiations between the parties.

The form of Agreement of Limited Partnership contained a provision, designated Section 3.7 and entitled "Capital Transaction," which provided as follows:

3.7 *"Capital Transaction"* Any Partnership transaction resulting in the receipt of cash or other consideration (other than the receipt of capital contributions to the extent necessary for the uses for which it was contributed) from the sale, disposition or refinancing of any Partnership asset that is capital in nature including without limitation sales, condemnations, recoveries of damage awards and insurance proceeds (other than business or rental interruption insurance proceeds) or any borrowing or mortgage refinancing with respect to any such asset.

The form of Agreement of Limited Partnership contained a provision, designated Section 4.1 and entitled "Capital Contributions," which provided as follows:

4.1 *Capital Contributions.*

(a) *General Partner.* The General Partner shall not be required to make any Capital Contribution to the Partnership.

(b) *Limited Partner.* The Limited Partner shall contribute capital to the Partnership at the times and in the amounts set forth in the Business Plan and Budget upon not less than five (5) business days prior written notice from the General

Partner provided, however, the Limited Partner shall not be required to make any further Capital Contribution to the Partnership (a) if any information with respect to the Property submitted to the Limited Partner by the General Partner or an Affiliate of the General Partner contained any untrue statement of a material fact or omitted to state a material fact which was necessary to make the information submitted not materially adversely misleading, or (b) subject to the Limited Partner indemnifying the General Partner from liabilities to third parties incurred as a direct result of a required Capital Contribution not being made, if, at any time prior to acquisition of the Property by the Partnership, the Property, or its prospects, or the Partnership's ability to carry out the Business Plan in accordance with the Budget have been materially adversely affected in any manner.

(c) If the Limited Partner fails to make nay required Capital Contribution, the General Partner shall have the following rights and alternatives:

(i) to lend to the Partnership all or a portion of the amount that the Limited Partner has failed to so contribute which shall (1) bear interest at the rate of one percent (1%) per annum above the Prime Rate, (2) to be secured by the interest of the Limited Partner in the Partnership, and (3) be repaid out of the amounts otherwise payable to the Limited Partner under this Agreement;

(ii) to cause the Partnership to borrow all or a portion of the amount that the Limited Partner has failed to so contribute from any third party source on commercially reasonable terms, the repayment of which will be charged against the amounts otherwise payable to the Limited Partner under this Agreement;

(iii) to purchase the interest of the Limited Partner for an amount equal to the limited Partner's Unrecovered Capital; or

(iv) dissolve the Partnership.

The General Partner must elect one of the remedies set forth above or to foreclose the security interest on the interest of the Limited Partner within 30 days after notice from the General Partner of any such failure by the Limited Partners to make a required Capital Contribution by written notice to the Limited Partner.

The form of Agreement of Limited Partnership contained a provision, designated Section 5.3 and entitled "Allocation of Income, Gains, Losses, and Deductions from a Capital Transaction," which provided as follows:

5.3 *Allocation of Income, Gains, Losses and Deductions from a Capital Transaction.*

(a) The excess of income and gains over losses and deductions from a Capital Transaction shall be allocated between the General Partner and the Limited Partner for each fiscal year, or portion thereof, in the following order of priority;

(i) If either or both Partners have a negative Adjusted Capital Account Balance, first to the Limited Partner to the extent of the Limited Partner's negative Adjusted Capital Account Balance and thereafter to the General Partner to the extent of the General Partner's negative Adjusted Capital Account Balance;

(ii) To the Limited Partner, to the extent of the Limited Partner's Unrecovered Capital;

(iii) To the Limited Partner, to the extent of the Limited Partner's Preferred Return; and

(iv) Thereafter 50% to the General Partner and 50% to the Limited Partner.

(b) The excess of losses and deductions over income and gains from a Capital Transaction shall be allocated 50% to the General Partner and 50% to the Limited Partner.

The form of Agreement of Limited Partnership contained a provision, designated Section 6.1 and entitled "Management of Partnership Business", which provided as follows:

6.1 *Management of Partnership Business.* Subject to the right of Limited Partner to consent to certain matters as provided elsewhere in this Agreement, the

General Partner shall have complete and exclusive control over the management, conduct and operation of the Partnership Business and affairs. The General Partner shall be required to devote such time, effort and skill that may be necessary to implement the Business Plan and for the successful conduct of the Partnership's Business.

The form of Agreement of Limited Partnership contained a provision, designated Section 6.2 and entitled "Compensation of the General Partner," which provided the following:

6.2 *Compensation of the General Partner.*

The General Partner shall be entitled to an acquisition fee, management fees and leasing commissions as set forth in the Business Plan and Budget and the Management Agreement, but shall not otherwise be entitled to compensation for its services. The General Partner shall be entitled to reimbursement from the Partnership for all ordinary and necessary out-of-pocket costs incurred directly in connection with the business of the Partnership, but specifically excluding compensation of officers or employees of the General Partner or any Affiliate of the General Partner or for overhead expenses of the General Partner or any Affiliate of the General Partner.

The form of Agreement of Limited Partnership contained a provision, designated Section 7.1 and entitled "Purchase Rights Between Partners", which provided as follows:

7.1 *General.* Either Partner may at any time make an offer of purchase and sale to the other Partner on the terms and conditions set forth herein.

The form of Agreement of Limited Partnership contained a provision, designated Section 7.2 and entitled "Determination of Purchase Price," which provided as follows:

7.2 *Determination of Purchase Price.* The offer shall be in writing and specify a value for the Property and other items of Partnership Property, other than cash, cash equivalents, receivables, prepaid items and the like. The offer shall provide that the offeror or his designee will purchase the partnership interest of the other partner at a price equal to the amount that the offeree partner would receive on liquidation of the Partnership if the Property were sold at the specified price taking into account normal prorations of receivables, payables, prepaid expenses and deferred charges with respect to the Property, all liabilities of the Partnership paid, and the remaining assets distributed to the Partners in accordance with this Agreement. If, within ten (10) days after submitting the offer, the offeror Partner has not received written communication from or had a conversation with the offeree Partner acknowledging or regarding the offer, a second copy of the offer shall be sent to the offeree Partner by Federal Express or a similar overnight courier service. In the event the General Partner is the offeror, he shall provide in his offer a certified and complete disclosure of any material facts relating to the value of the Property and other items of Partnership Property, other than cash, cash equivalents, receivables, prepaid items and the like and the partnership interest which it has not previously disclosed in writing to the Limited Partner. In the event the Limited Partner is the offeror, the General Partner shall provide such disclosure within ten (10) days of receipt of the offer and the Limited Partner shall then have ten (10) days after receipt of such disclosure to revise its offer if any new information materially affecting value was received. Upon making or receiving an offer, the General Partner shall cause the Partnership's accountants promptly to determine the amount of the Partnership's assets (other than the Property) net of liabilities in accordance with the accounting procedures and practices previously followed by the Partnership, with the view that the combined value of the partnership interests of the General Partner and Limited Partner shall be equal to the value placed on the Property by the Offeror plus the amount of the other assets of the Partnership less the liabilities of the Partnership as reflected in its books. Any delay in determining the amount of the Partnership's assets and

liabilities or the purchase price shall not increase the period within which the election required by Section 7.3 must be made. After an offer has been made, the Partnership shall not enter into any leases for periods longer than six (6) months or any other material contracts without the approval of both the General Partner and the Limited Partner.

The form of Agreement of Limited Partnership contained a provision, designated Section 7.3 and entitled "Right of Offeree," which provided as follows:

7.3 *Right of Offeree.* Within forty-five (45) days following the offer or thirty (30) days following the revised offer (or, in the event the Limited Partner is the offeree, within sixty (60) days following the date of the offer), the offeree Partner shall elect either (i) to sell its Partnership interest to the offeror Partner or its designee for the purchase price for such interest determined as provided in Section 7.2, or (ii) to elect to purchase from the offeror Partner its Partnership interest for the purchase price so determined. The offeree Partner may designate any affiliate or designee of said Partner to purchase on its behalf. Absent an affirmative election by the offeree Partner, the offeree Partner shall be deemed to have elected to sell its Partnership interest to the offeror Partner or its designee.

The form of Agreement of Limited Partnership contained a provision, designated Section 8.2 and entitled "Approval Rights of Limited Partner," which provided as follows:

8.2 *Approval Rights of Limited Partner.* The Limited Partner shall have the right to approve the following matters in addition to any matters specified elsewhere in this Agreement:

1. Any amendment (except as provided in Section 13.1) to this Agreement, including any material amendment to the Budget or Business Plan.

\* \* \* \* \* \*

3. The sale, exchange, lease, mortgage, pledge or other transfer of all or a substantial part of the assets of the Partnership, other than leases in the ordinary

course of business which comply with the terms of the Business Plan.

4. A change in the nature of the business of the Partnership.

\* \* \* \* \* \*

7. Any transaction of the Partnership (including any amendment or any existing transaction) in which the General Partner or any Affiliate of a General Partner has an actual or potential conflict of interest with the Partnership or the Limited Partner and any amendment to or cancellation of the Management Agreement other than those necessary to make the Management Agreement consistent with the Business Plan and Budget then in effect.

The form of Agreement of Limited Partnership contained a provision, designated Section 11.2 and entitled "Winding Up and Liquidation," which provided as follows:

11.2 *Winding Up and Liquidation.*

(a) Upon the dissolution of the Partnership the General Partner (or another party designated by the Limited Partner) shall cause the Partnership assets to be sold.

(b) Upon the winding up and termination of the business and affairs of the Partnership, its assets (other than cash) shall be sold, its liabilities and obligations to creditors and all expenses incurred in its liquidation shall be paid or provided for, and all resulting items of Partnership income, gain, loss or deduction shall be credited or charged to the capital accounts of the Partners in accordance with the principles of Article V of this Agreement. During said same time period, the net proceeds from such sales and all other assets of the Partnership shall be distributed among the Partners in the following order of priority:

(i) First, to the payment and discharge of all of the Partnership's debts and liabilities, excluding liabilities to Partners, except the claims of secured creditors whose obligations will be assumed or otherwise transferred upon liquidation of the Partnership's assets;

(ii) Second, to establish any reserves which the General Partner (or other liquidating party) may deem necessary, ap-

propriate or desirable for any future, contingent or unforeseen liabilities, obligations, or debts of the Partnership or of the General Partner arising out of or in connection with the Partnership which are not yet payable or have not yet been paid. Such reserves shall be paid over by the General Partner to an independent escrow holder at the request of the Limited Partner, to be held by it for the purpose of disbursing such reserves in payment of any of such liabilities, obligations and debts and, at the expiration of such reasonable period as the General Partner shall deem necessary, to distribute the balance thereafter remaining in the manner provided below;

(iii) Third, to the payment and discharge of all the Partnership's debts and liabilities to Partners to the extent permitted by law;

(iv) Fourth, to the Partners in accordance with the positive balances in their capital account by the end of the taxable year in which the liquidation occurs (or, if later, within ninety (90) days after the date of the Partnership's liquidation).

The form of Agreement of Limited Partnership contained a provision, designated section 14.4 and entitled "Entire Agreement," which provided as follows:

14.4 *Entire Agreement.* This Agreement contains the entire understanding between the parties which respect to the subject matter hereof and supersedes any prior understandings and agreements between them with respect thereto.

The form of Agreement of Limited Partnership contained a provision, designated Section 14.5 and entitled "Recovery of Attorneys' Fees," which provided as follows:

14.5 *Recovery of Attorneys' Fees.* In the event suit is brought to enforce or interpret any part of this Agreement, the prevailing party shall be entitled to recover, as an element of his costs of suit and not as damages, reasonable attorneys' fees to be fixed by the court. The "prevailing party" shall be the party who is entitled to recover his costs of suit, whether or not the suit proceeds to final judgment. A party not entitled to recover his costs shall not recover attorneys' fees. No sum for attorneys' fees shall be counted in calculating the amount of a judgment for purposes of determining whether a party is entitled to recover his costs or attorneys' fees.

## C. THE FORM OF MANAGEMENT AGREEMENT

Appended to the Master Agreement was a form of Management Agreement. The form of Management Agreement contained a provision, designated Section 3 and entitled "Agent's Compensation," which provided as follows:

3. AGENT'S COMPENSATION.

A. Owner shall pay Agent an annual management fee equal to three percent (3%) of the gross income and collections from the Property from all sources during each year of the term hereof (as appropriately prorated for any partial year and computed on an accrual basis), including, but not limited to, rents, additional rents, alteration charges, parking fees and all other charges and payments due to Owner from any tenants, licensees, concessionaires or other occupants or users of any space at the Property. Notwithstanding the foregoing, in the event the Property or any portion thereof shall be leased to tenants on a net lease basis, the revenues from such net leases will be equitably adjusted and increased for purposes of calculating the management fee set forth above, which fee is intended to be based on an amount of collected gross income that reflects the amount of the rentals which would have been paid if such net lease had been written on a "gross lease" rather than a "net lease" basis, pursuant to which the tenant would pay to Owner, as landlord, its pro rata share of real estate and other applicable charges. Such payments shall be made concurrently with the rendering by Agent of its quarterly statements to Owner as hereinafter set forth.

B. In addition, Owner shall pay Agent a commission on all leases (including renewals thereof) involving the Property which are consummated or initiated during the term of this Agreement, in an amount to be computed in accordance with Sched-

ule 1 annexed hereto and made a part hereof, whether or not a broker other than Agent has been the procuring cause of such a lease. If a broker other than Agent has been a procuring cause of such lease, such other broker shall be entitled to receive a full commission at the prevailing rate therefor. Payments of such commissions shall be made concurrently with the execution and delivery of the particular lease.

The form of Management Agreement contained a provision, designated Section 4 and entitled "Agent's Duties," which provided as follows:

### 4. AGENT'S DUTIES

A. For and in consideration of the compensation provided in Article 3 hereof, Agent, as agent for owner, shall:

(a) Use its best efforts to perform its duties in the leasing, management, operation and maintenance of the Property in such manner that the Property shall be and remain a high-quality industrial property;

(b) Conduct all negotiations connected with any leases or renewal or expansion agreements (and leasing commission agreement and other documents in connection therewith) for any part of the Property, and execute and deliver as agent for Owner all such leases and related documents which comply with leasing guidelines theretofore approved by Owner from time to time, provided that prior to executing any lease or any other document in connection therewith which does not comply with such guidelines, Agent will obtain Owner's approval to the basic terms of the proposed lease or such other document, including the cost of tenant improvements, and further provided that all legal and other professional fees in connection with said negotiations and document preparation shall be at the expense of Owner;

(c) Use its best efforts to collect all income from the Property, including, without limitation, all rent, additional rent, parking fees, maintenance and other charges from tenants, licensees, concessionaires, occupants and users of any portion of the Property, and when, as and if Agent or Owner shall deem it proper and expedient, to serve notices upon tenants to quit space occupied by them and to terminate their leases, or likewise to terminate any licenses or occupancy agreements granted to licensees, occupants, tenants, concessionaires, users or others;

(d) Institute, in its own name or in the name of Owner, but in any event at the expense of Owner, any and all legal actions or proceedings to collect rent or other income from the Property or to evict or dispossess tenants or other persons in possession therefrom, or to cancel or terminate any lease for the breach thereof or default thereunder by the tenant;

(e) Supervise the moving in and out of all tenants and, so far as possible, to arrange the dates thereof so that there shall be a minimum of disturbance to the operation of the Property and of inconvenience to other tenants;

(f) Receive, consider and handle all inquiries or requests of tenants;

(g) Arrange for an advertising and public relations program for the Property of a type and format to be determined by Agent but at Owner's cost, provided that Agent shall be required to obtain prior written approval of Owner for any such costs in excess of the amounts allocated for such expenses in the Budget (as defined in Article 6 hereof);

(h) As agent for Owner, hire, pay, direct, supervise and discharge all operating and service employees (and service contractors, space planners and property tax or other consultants) performing services in or about or for the Property, including specifically, but not limited to, the property manager, the superintendent and any security personnel; all such employees at the Property shall be employees of Owner, and Agent shall not be liable to Owner or any third party for the acts or omissions of such employees; Owner shall pay for the wages or compensation of such employees and for the fees of such contractors, consultants and

planners as part of the cost of operating the Property; Agent shall, in the hiring of such employees, contractors and consultants, use reasonable care to select qualified, competent and trustworthy employees, contractors and consultants; Agent, as agent for Owner, shall negotiate (in conjunction with other owner-representatives and in accordance with practice in the metropolitan area) with any labor union lawfully entitled to represent building employees and will enter into collective bargaining agreements or other labor contracts no less advantageous to Owner than contracts which shall be standard for buildings of similar character in the area;

(i) Procure and maintain, at the expense of Owner, adequate worker's compensation insurance as required by law covering all of the aforesaid employees;

(j) Prepare, maintain and file all necessary reports and records with respect to withholding taxes, social security taxes, unemployment insurance, disability insurance (if any), the Fair Labor Standards Act, and all other legally required statements and reports pertaining to labor employed in or about the Property;

(k) Permit any partner of Owner, upon reasonable advance notice to Agent, at all times during business hours on business days, to have access to the books, records, files, papers, accounts and contracts maintained by Agent for the Property;

(l) Provide, at Owner's expense with respect to employees at the Property and at Agent's expense with respect to employees in Agent's regional or main offices, all bookkeeping and clerical services, including the maintenance of payroll records, and the services of such leasing, managing, supervising and bookkeeping personnel, including without limiting the generality of the foregoing, Agent's executive personnel, and such other incidental services, an may be necessary to carry out the purposes of this Agreement; to the extent that only part-time services at or for the Property are required from any of the foregoing employees or personnel for the performance of the aforesaid functions and services, their salaries shall be appropriately prorated for such part of their time as may be spent at or for the Property;

(m) Enter into contracts, as agent for, on behalf of and at the expense of Owner for the furnishing to the Property of electricity, gas, water, steam, telephone, cleaning (including window cleaning), vermin extermination, elevator, escalator and boiler maintenance, air-conditioning maintenance, master television antennae and electronic security installations (if any) service and other utilities and/or services as Agent deems advisable;

(n) Purchase all material and supplies, as agent for, on behalf of and at the expense of Owner, which Agent shall deem necessary to properly maintain and operate the Property;

(o) Make or install or cause to be made or to be installed, as agent for, on behalf of and at Owner's expense, such alterations, repairs, decorations, replacements, equipment or installations (all hereinafter collectively referred to as "Improvements") in or to any portion of the Property as shall be reasonably required to preserve, main, and keep the Property as a high-quality industrial property; provided, however, any provision in this Agreement to the contrary notwithstanding, it is agreed that Agent shall not, without the prior written consent of Owner (except in the case of any emergency or as provided in Article 7 hereof or for expenditures made and obligations incurred pursuant to a Budget), make or contract to make any one item of Improvements in or to the Property the total cost of which shall exceed the amounts allocated therefor in the Budget;

(p) Give Owner and Owner's insurance carriers prompt notice of any claims made against Owner or Owner and Agent and cooperate fully with Owner and with any insurance carrier to the and that all such claims will properly investigated and defended; Agent shall

not without Owner's prior consent hire any attorneys to defend any such claim;

(q) Cause, as agent for, on behalf of and at Owner's expenses, insofar as reasonably possible, all such acts and things to be done in or about the Property as shall be necessary to comply with all statutes, ordinances, laws, rules, regulations, orders and determinations affecting or issued in connection with the Property by any governmental authority having jurisdiction thereof, as well as with all orders and requirements applicable to the Property of the recognized board of fire underwriters for the Chicago area or any other board which may now or hereafter exercise similar function; provided, however, that Agent shall not, without the prior written consent of Owner, unless permitted pursuant to the Budget, make any alterations or repairs so ordered or so required, the cost of which shall exceed the amount allocated therefor in the Budget, except that in case of emergency or if the failure promptly to comply with any order or violation could expose Agent or Owner to the imminent danger of criminal liability (other than payment of fines), Agent may cause the same to be done or complied with, irrespective of the amount of the cost thereof;

(r) notify Owner promptly in writing of all occurrences and facts necessary to enable Owner to determine policy with respect to the Property and the management thereof; and

(s) comply or cause compliance with all the terms, conditions and obligations of any lease or other agreement executed by owner or by Agent on behalf of Owner which shall relate to any matters connected with renting, operation or management of the Property, unless prevented or delayed by strikes, riot, civil commotion, war, inability to obtain materials because of governmental restrictions of Acts of God or the public enemy or any other cause beyond Agent's control, provided that Owner shall have notified Agent of such lease or other agreement and to furnish Agent with a copy thereof.

B. (1) Agent shall deposit all monies received by Agent for on behalf of Owner (less any sums properly deducted by Agent pursuant to any provisions of this Agreement) in a special bank account or accounts maintained by Agent for the deposit of monies received by Agent for or on behalf of Owner (including discounts, rebates, commissions, or refunds obtained by Agent with respect to contracts entered into in connection with purchases of material and supplies delivered to the Property), and to disburse and pay the same, but only in the amounts and at the times the same are required to be made in connection with the ownership or operation of the Property on the account of:

(i) all assessments and charges of every kind (including, but not limited to real estate and personal property taxes) and interest and penalties thereon, imposed by any governmental authority having jurisdiction and all principal and interest payments due under any mortgage or deed of trust constituting a lien on the Property or any portion thereof, provided that Owner may, if it so desires and after due advance notice to Agent, make the payment provided for in this subparagraph (i) directly to the governmental authority having jurisdiction or to the holder of such mortgage or deed of trust,

(ii) license, permit, and insurance appraisal fees and fines, penalties, legal fees and court disbursements incurred in connection with the operation of the Property,

(iii) premiums on all policies of insurance authorized under this Agreement,

(iv) payroll, service contracts, utilities, management fees, leasing commissions, repairs and any and all other disbursements authorized by this Agreement, and

(v) except as otherwise herein expressly provided, any other items which are properly and customarily disbursed by managing agents of comparable properties in the Chicago area;

(2) Agent shall render statements and make payments to Owner as follows:

(i) on or before the fifteenth (15th) day of each calendar quarter, Agent will render to Owner a detailed quarterly statement for the previous calendar quarter which shall set forth all receipts and disbursements handled by Agent on behalf of and for the account of the Owner as authorized by this Agreement; the said quarterly statements shall set forth income and expenses with appropriate totals, in such form as is used from time to time by Agent in connection with the management of the Property, provided the same is reasonably acceptable to Owner;

(ii) together with each statement furnished pursuant to subparagraph (i) of this subparagraph, Agent will remit to the Owner the amount collected by Agent during the said preceding calendar quarter, less disbursements and advances made on behalf of and for the account of the Owner as authorized by this Agreement, and less Agent's compensation herein specified, and less also such reasonable sums as Agent may deem necessary or appropriate operating reserves to meet obligations which will or may become due thereafter, taking into account estimated future income.

(3) Except as specifically otherwise provided for herein, Agent shall not, without the prior written consent Owner, advance, pay or contract to pay any monies on behalf of or in the name of Owner. All monies so advanced by Agent on behalf of Owner in accordance herewith shall be repaid by Owner without interest unless Owner shall have failed to repay Agent for monies so advanced within ten (10) days after written demand, in which event Owner shall pay interest at the prevailing commercial interest rate from the date of advance to the date of reimbursement. Nothing herein contained, however, shall be construed to obligate Agent to make any advances for the account of Owner.

The form of Management Agreement contained a provision, designated Section 5 and entitled "Owner's Undertakings," which provided as follows:

5. OWNER'S UNDERTAKINGS. Owner covenants and agrees that:

(a) Agent is hereby granted the authority to perform all of Agent's duties as set forth in this Agreement;

(b) Wherever in this Agreement it is provided that Agent may take any action in the name of or on Owner's behalf, Owner will promptly execute any documents which may be required by Agent for the purposes of carrying out any of Agent's functions as same are set forth herein or to evidence Agent's authority granted hereby; Agent is hereby appointed as Owner's attorney-in-fact for the purpose of making all payments and executing all documents which Agent is authorized to make or enter into hereunder for or in behalf of Owner;

(c) Owner will refer to Agent all inquiries regarding the rental of any part of the Property or renewals or expansions of leases;

(d) Owner shall reimburse Agent monthly for all out-of-pocket disbursements made or incurred by Agent, its officers, agents or employees in connection with the Property (except for Agent's direct costs of salaries and incidental expenses payable by Agent pursuant to Article 4, sub-paragraph (h)), including but not limited to actual costs or travel, meals and lodging of personnel of Agent incurred while performing Agent's duties hereunder; and

(e) Owner shall provide, without any charge therefore to Agent, any space on or in the Property and any furniture, equipment, supplies and utilities therefor as many be reasonably required by Agent for the performance of its duties hereunder.

The form of Management Agreement contained a provision, designated Section 9 and entitled "Non–Assignability," which provided as follows:

9. Non–Assignability. Neither the rights nor the obligations of Agent or Owner under this Agreement shall be assigned by either of them and any attempted as-

signment without the prior written consent of the other party shall be voidable at the option of the nonassigning party.

Notwithstanding any other provisions of this agreement herein contained, the rights and obligations of the parties hereto may be assigned to their respective parent or affiliates or to any successors resulting from consolidation, merger, spin-off, liquidation or reorganization of themselves or their respective parent corporations, provided that the assignee shall assume all of the assignor's obligations under this Agreement. In such event, the assignor shall be released from any further obligations under this Agreement.

The form of Management Agreement contained a provision, designated Section 10.B under the heading "Miscellaneous Provisions", which provided as follows:

B. This Agreement cannot be changed or modified, varied or altered except by an agreement in writing executed by each of the parties hereto. This Agreement constitutes all of the understandings and agreements of whatsoever kind or nature existing between the parties in connection with the agency herein created.

## D. THE GUARANTY AGREEMENT

The Master Agreement also contained a form Guaranty Agreement which the parties agreed would be executed by Sheridan as guarantor at the time of execution of the Master Agreement. The form Guaranty Agreement guaranteed Sheridan's obligations to Burch as Trustee or Co–Trustee under Section 8(b) of the Master Agreement and was attached to the Master Agreement as Exhibit E. On March 5, 1987, Sheridan executed and delivered to Burch a Guaranty Agreement which was, in all material respects, identical to the form Guaranty Agreement.

## E. THE INDEMNITY AGREEMENT

On or about July 31, 1988, Sheridan and Burch, including any trust for which Burch is a trustee and any partnership in which a trust of which Burch is a trustee or co-trustee are partners or any corporation in which a trust in which Burch is a trustee or co-trustee are shareholders, entered into an Indemnity Agreement under which Sheridan agreed to indemnify Burch from any and all losses and expenses which Burch might suffer as a result of actions or omissions of the corporate general partners and the corporate manager of the subject limited partnerships.

## F. THE FIRST AMENDMENT TO MASTER AGREEMENT

On or about July 31, 1988, Edgemont and Burch entered into a First Amendment to Master Agreement which amended various sections of the Master Agreement.

The First Amendment amended Paragraph 4(a) of the Master Agreement to read as follows:

4. *Minimum Investment Return.*

Supplementing the provisions of the various Partnership Agreements relating to the Preferred Return for each Investment Partnership, Sheridan agrees that it will not be entitled to receive any return from any Investment Partnership until the Burch Partner of each Investment Partnership has received a cumulative preferred yield equal to at least the Preferred Return agreed to for that partnership less two percent (2%) per annum. Said amount shall be compounded annually in arrears. It is not intended that the Subsidy Payments and repayments thereof under this Section 4 effect amounts otherwise payable to partners other than Burch and Sheridan. In order to implement this it is specifically agreed that:

(a) If at any time there is Distributable Cash or Proceeds from a Capital Transaction (collectively "Available Cash Proceeds") from an Investment Partnership in excess of the Preferred Return but there are one or more other Investment Partnerships where the Burch Partner has not received a cumulative preferred yield equal to at least the Preferred Return agreed to for that partnership less two percent (2%) per annum (compounded annually in arrears) (each a "Subsidized Partnership"), the next Available Cash Proceeds otherwise payable to the Partners in excess of the Burch's Partner's Preferred Return

shall be paid instead pro rata to the Burch Partner(s), in each such Subsidized Partnership (each such payment a "Subsidy Payment") until each such Burch Partner has received a cumulative preferred yield equal to at least the Preferred Return agreed to for that partnership less two percent (2%) per annum (compounded annually in arrears). Any additional amounts of Available Cash Proceeds from such other Investment Partnership(s) making a Subsidy Payment shall be paid in accordance with the Partnership Agreement(s) for such Investment Partnership(s) making a Subsidy Payment and this Agreement. All Subsidy Payments provided in this Section 4(a) shall be made from Investment Partnership(s) designated by Burch. Subsidy Payments made under this Section 4(a) shall be repaid before any Subsidy Payments under Section 4(c).

The First Amendment amended Paragraph 7 of the Master Agreement to read as follows:

### 7. *Management Agreement.*

Promptly after the formation thereof pursuant to the provisions of this Agreement, each Investment Partnership shall enter into a management agreement (a "Management Agreement") between each such Investment Partnership, as owner, and Sheridan (or its affiliate or designee), as managing agent, in the form annexed hereto as Exhibit D and made a part hereof, pursuant to the terms of which Sheridan (or its approved affiliate) shall manage and operate each Approved Property on behalf of the acquiring Investment Partnership. Sheridan (or its approved affiliate or approved designee), as the managing agent, shall be entitled to receive a management fee (the "Management Fee") in an amount which the parties contemplate shall approximate its costs in managing the property. Except as the parties may from time to time agree in order to better coordinate the fee with Sheridan's costs, responsibilities and/or the results achieved, the fee shall be equal to three percent (3%) of the annual collected gross income from each Approved Property. Said Management Agreement may also provide for leasing fees to Sheridan (in addition to commissions and fees paid to outside brokers) in an amount not to exceed twenty-five percent (25%) of the commission payable to outside brokers for new leases and for renewal leases under 50,000 square feet, which leasing fees are intended to be used primarily to provide incentive compensation to the Manager's employees responsible for leasing and renewing leases. Leasing commissions, if any, for renewal leases over 50,000 square feet shall be subject to agreement by both parties. It is understood and agreed that income from all sources is to be included in the calculation of collected gross income for purposes of calculating the amount of the Management Fee; provided, however, that with respect to properties which are leased to tenants on a net lease basis, the revenues from such net leases will be equitably adjusted and increased where appropriate for purposes of calculating the applicable Management Fees, which fees are intended to be based on an amount of collective gross income that reflects the amount of the rentals which would have been paid if such net lease had been written on a "gross lease" rather than a "net lease" basis, pursuant to which the tenant which pay to the Investment Partnership its pro rata share of real estate and other applicable tax increased over the initial lease year, together with energy, maintenance and other applicable charges. The Management Fees as set forth above shall from time to time be increased by such amounts as Sheridan from time to time determines is necessary to cover its costs provided that the total cumulative increases in the Management Fees for any property shall not exceed an amount equal to the Acquisition Fee for said property.

## G. *THE 13 LIMITED PARTNERSHIPS*

### 1. *Parties*

Between April, 1987 and May, 1990, Burch and Sheridan created some 16 limited partnerships for the purpose of acquiring, operating, and ultimately disposing of commercial

948

or residential real estate. Thirteen of these limited partnerships are directly involved in this litigation.

The 13 limited partnerships, their respective dates of formation, their respective general partners, and their respective limited partners are summarized in the chart below.

| ENTITY | DATE OF FORMATION | GEN. PARTNER | LTD. PARTNER |
|---|---|---|---|
| W 65 Bedford Park Associates | 4/27/87 | W65LP | BOMAT |
| CG Coral Gables Associates Limited | 9/16/87 | CGLP | BOMAT |
| TC Associates Limited Partnership | 11/11/87 | TCLP | BOSP |
| SW Associates Limited Partnership | 4/29/88 | SWLP | BOMAT |
| 32500 Van Born Associates | 12/31/88 | WMLP | BOMAT |
| 2100 Corporate Drive Associates Limited Partnership [1] | 3/20/89 | Addison LP | BOMAT |
| WC West Chicago Associates Limited Partnership | 3/30/89 | West LP | BOMAT |
| MP Melrose Park Associates Limited Partnership | 4/03/89 | Melrose LP | BOSP |
| 601 West Polk Associates Limited Partnership | 4/06/89 | Polk LP | BOSP |
| 32500 Capital Avenue Associates Limited Partnership | 6/29/90 | Capital LP | BOMAT |
| Newtown Associates Limited Partnership [2] | 12/11/89 | Newtown LP | BOSP ROBAR ROBALI |
| WC Fields Limited Partnership | 1/24/90 | Fields LP | BOSP |
| Barnside Apartment Associates Limited Partnership | 5/29/90 | Barnside LP | BOMAT |

[1] This partnership is also referred to by the parties as 2120 Corporate Drive Associates Limited Partnership.

[2] This is the effective date of the Amended and Restate Agreement of Limited Partnership of Newton Associates Limited Partnership.

In every instance, the general partner was a limited partnership, the general partner of which was a corporation solely owned by Sheridan. Edgemont was not a general or a limited partner in any of the 13 partnerships. In every instance, the contract manager or agent was RS & P Management. In every instance but one, the limited partner was either BOSP or BOMAT. The one exception was Newtown Associates Limited Partnership, in which BOSP and two of its affiliates were the limited partners.

· In the case of each limited partnership, a formal written Agreement of Limited Partnership was executed by the general partner and the limited partner or limited partners. On a number of occasions, these formal writ-

ten Agreements of Limited Partnership were amended by written amendments which also were duly executed by the appropriate general partner and limited partner or limited partners.

By their terms, 10 of the subject Agreements of Limited Partnership were to be governed by the laws of the State of Illinois; two of the subject Agreements of Limited Partnership, those relating to CG Coral Gables Associates Limited and Newtown Associates Limited Partnership, were to be governed by the laws of the State of Florida; and one of the subject Agreements of Limited Partnership, that relating to Barnside Apartment Associates Limited Partnership, was to be governed by the laws of the State

of Arizona. For purposes of this litigation, the parties stipulated that the laws of the various states are substantially similar on the issues in this litigation.

### 2. *Capital Contributions, Loans and Fees*

In every instance, the Sheridan-owned and controlled management corporation or agent received management fees. In every instance, the Sheridan-owned and controlled management corporation or agent has received leasing commissions which were computed as a percentage of annual rental to be paid by new tenants and tenants who had renewed their leases.

### 3. *The Agreements of Limited Partnership*

Between April 27, 1987 and May 29, 1990, the parties entered into 13 Agreements of Limited Partnership. In all material respects, in every instance but two, the Agreements of Limited Partnership were identical in form and content to that which was attached to the Master Agreement as Exhibit B. In the two exceptional partnerships, Newtown Associates Limited Partnership and WC Fields Limited Partnership, the Agreement of Limited Partnership differed from the form Agreement of Limited Partnership in the language of Section 5.3(a).

In the Amended and Restated Agreement of Limited Partnership of Newtown Associates Limited Partnership, Section 5.3(a) provided as follows:

5.3 *Allocation of Income, Gains, Losses, and Deductions from a Capital Transaction.*

(a) The excess of income and gains over losses and deductions from a Capital Transaction shall be allocated among the General Partner and the Limited Partners for each fiscal year, or portion thereof, in the following order of priority:

(i) If any Partner has a negative Adjusted Capital Account Balance, first to the Limited Partners, proportionately in accordance with the Limited Partners' Ratios to the extent of the Limited Partners' negative Adjusted Capital Account Balances and thereafter to the General Partner to

the extent of the General Partner's negative Adjusted Capital Account Balance;

(ii) To the Limited Partners, proportionately in accordance with the Limited Partners' Ratios, to the extent of the Limited Partners' Unrecovered Capital;

(iii) To the Limited Partners, proportionately in accordance with the Limited Partners' Ratios, to the extent of the Limited Partners' Preferred Return; and

(iv) Thereafter 50% to the General Partner and 50% to the Limited Partners, proportionately in accordance with the Limited Partners' Ratios.

Section 5.3(a)(ii) was later amended to read:

5.3(a)(ii) To the Limited Partners, proportionately in accordance with the Limited Partners' Ratios, to the extent of the difference between the Limited Partners' Unrecovered Capital and the balance in the Capital Account of said Limited Partner;

In the Agreement of Limited Partnership of the WC Fields Limited Partnership, the language underlined below was added to the language of Section 5.3(a)(ii) of the form of Agreement of Limited Partnership which was appended to the Master Agreement:

5.3 *Allocation of Income, Gains, Losses, and Deductions from a Capital Transaction.*

(a) The excess of income and gains over losses and deductions from a Capital Transaction shall be allocated between the General Partner and the Limited Partner for each fiscal year, or portion thereof in the following order of priority:

(i) If either or both Partners have a negative Adjusted Capital Account Balance, first to the Limited Partner to the extent of the Limited Partner's negative Adjusted Capital Account Balance and thereafter to the General Partner to the extent of the General Partner's negative Adjusted Capital Account Balance;

(ii) To the Limited Partner, to the extent of *the difference between* the Limited Partner's Unrecovered Capital *and the balance in the Capital Account of the limited partner;*

(iii) To the Limited Partner, to the extent of the Limited Partner's Preferred Return; and

(iv) Thereafter 50% to the General Partner and 50% to the Limited Partner.

### 4. The Management Agreements

Between April 27, 1987 and January 24, 1990, twelve of the subject partnerships, as owners, and RS & P Management entered into Management Agreements for the management of the real property owned by the subject limited partnerships. In all material respects, in every instance but two, that Management Agreement was in a form and content identical to the form of Management Agreement which was attached to the Master Agreement as Exhibit D. In the two exceptional partnerships, W 65 Bedford Park Associates and Newtown Associates Limited Partnership, the Management Agreement differed from the form Management Agreement attached to the Master Agreement as Exhibit D in the language of Section 3.A.

Section 3.A of the Management Agreement for W 65 Bedford Park Associates differed from the form Management Agreement in that it provided as follows:

3. AGENT'S COMPENSATION.

A. Owner shall pay Agent an annual management fee equal to two and one-half percent (2½%) of all rents, additional rents, alterations charges, parking fees, real estate taxes and other amounts payable to Owner or any other party by Continental Can or the single tenant, if any, which leases the entire premises now occupied by Continental Can following the expiration or termination of the Continental Can lease (the "Continental Can Successor"), and four percent (4%) of the gross income and collections from the Property from all sources other than rentals and other amounts payable by Continental Can and the Continental Can Successor, if any, including, but not limited to, rents, additional rents, alteration charges, parking fees, real estate taxes and other amounts payable to Owner or any other party form any tenants, licensees, concessionaires or other occupants or users of any space at the Property including tenants (other than the Continental Can Successor, if any) occupying any portion of the premises now occupied by Continental Can after the expiration or termination of the Continental Can lease. The amounts referred to in each case in the preceding sentence shall be deemed to refer to such amounts received during each year of the term hereof and shall be appropriately prorated for any partial year and computed on a cash basis. Notwithstanding the foregoing, in the event the Property or any portion thereof shall be leased to tenants on a net lease basis, the revenues from such net leases will be equitably adjusted and increased for purposes of calculating the management fee set forth above, which fee is intended to be based on an amount of collected gross income that reflects the amount of the rentals which would have been paid if such net lease had been written on a "gross lease" rather than a "net lease" basis, pursuant to which the tenant would pay to Owner, as landlord, its pro rata share of real estate and other applicable tax increases over the initial lease year, together with energy, maintenance and other applicable charges. Such payments shall be made concurrently with the rendering by Agent of its quarterly statements to Owner as hereinafter set forth.

B. In addition, Owner shall pay Agent a commission on all leases (including renewals thereof) involving the Property which are consummated or initiated during the term of this Agreement, in an amount to be computed in accordance with Schedule 1 annexed hereto and made a part hereof, whether or not a broker other than Agent has been the procuring cause of such a lease. If a broker other than Agent has been a procuring cause of such lease, such other broker shall be entitled to receive a full commission at the prevailing rate therefor. Payments of such commissions shall be made concurrently with the execution and delivery of the particular lease.

Section 3.A of the Management Agreement for Newtown Associates Limited Partnership differed from the form Management Agreement in that it provided as follows:

3. AGENT'S COMPENSATION.

A. Owner shall pay Agent an annual management fee based on a percentage of the gross income and collections from the Property from all sources during each year of the term hereof (as appropriately prorated for any partial year and computed on an accrual basis), including, but not limited to, rents, additional rents, alteration charges, parking fees and all other charges and payments due to Owner from any tenants, licensees, concessionaires or other occupants or users of any space at the Property. The annual management fee shall be equal to three percent (3%) of the gross income and collections as stated above from tenants, licensees, concessionaires or other occupants of the New Town Commerce Center section of the Property and four percent (4%) of the gross income and collections as stated above from tenants, licensees, concessionaires or other occupants of the South Florida Warehouse section of the Property. Notwithstanding the foregoing, in the event the Property or any portion thereof shall be leased to tenants on a net lease basis, the revenues from such net leases will be equitably adjusted and increased for purposes of calculating the management fee set forth above, which fee is intended to be based on an amount of collected gross income that reflects the amount of the rentals which would have been paid if such net lease had been written on a "gross lease" rather than a "net lease" basis, pursuant to which the tenant would pay to Owner, as landlord, its pro rata share of real estate and other applicable tax increases over the initial lease year, together with energy, maintenance and other applicable charges. Such payments shall be made concurrently with the rendering by Agent of its quarterly statements to Owner as hereinafter set forth.

On or about June 30, 1990, each of eleven of the partnerships and RS & P Management entered into a separate written Amendment to Management Agreement, which was by its terms effective as of the date of the original Management Agreement between the parties. Under the Amendment, the parties amended Paragraph 3.B and Schedule 1 of the Management Agreement, both of which related to the payment, computation, and amount of leasing commissions to be paid to the management corporation. The two partnerships which did not enter into such Amendments were WC Fields Limited Partnership and Barnside Apartment Associates Limited Partnership. Barnside Apartment Associates Limited Partnership and RS & P Management never entered into a Management Agreement for the management of the partnership.

5. *Assignment of the Management Agreements*

On or about April 23, 1991, RS & P Management assigned its rights and duties under the 12 Management Agreements at issue herein to Bridgewood. Sheridan and his daughter owned, in the aggregate, 60% of the stock of Bridgewood.

H. *THE EXERCISE OF BUY–SELL RIGHTS BY BOSP AND BOMAT*

In the Spring of 1991, BOSP and BOMAT, acting through Burch, wrote letters to each of the Plaintiffs to invoke their buy-sell rights under paragraph 7.1 of the respective Agreements of Limited Partnership. There then ensued an exchange of letters between the parties which is described more fully below.

1. *The Count I Partnerships*

a. *2120 Corporate Drive Associates Limited Partnership*

In a letter dated April 5, 1991 from BOMAT to Addison LP, the former offered to purchase the latter's interest in 2120 Corporate Drive Associates Limited Partnership ("2120 Corporate Drive) pursuant to Article VII of the Agreement of Limited Partnership of 2120 Corporate Drive.

In a letter dated April 19, 1991 from Addison LP to BOMAT, the former responded to BOMAT's April 5, 1991 offer to purchase as follows:

We respond to the Offer by electing to sell our interest as General Partner of the Partnership to your nominee Cast Corporation, or to you, if you prefer, pursuant to

Article VII of the Agreement. More specifically, we accept your value for the Property (as defined in the Partnership Agreement) of $4,100,000 (the "Value").

Based on the Value, the price you must pay for our interest in the Partnership under Article VII of the Partnership Agreement is $235,000 (the "Purchase Price").

In a letter dated May 10, 1991, from BOMAT to Addison LP, the former disagreed with Sheridan's interpretation of how the purchase price is calculated and demanded that Sheridan comply with the buy-sell provisions of Article VII as interpreted by BOMAT. In a letter dated May 21, 1991 from Addison LP to BOMAT, the former notified the latter of its contention that all material facts relating to the value of the property were disclosed to BOMAT and enclosed a balance sheet for the partnership, dated April 5, 1991. By a letter dated June 3, 1991 from BOMAT to Addison LP, BOMAT notified the latter of its contention that by its conduct, the general partner had agreed to sell its interest in the partnership pursuant to terms and conditions asserted by BOMAT based on its interpretation of Article VII of the Partnership Agreement. In a letter dated June 3, 1991 from BOMAT to RS & P Management, the former notified the latter that it was cancelling the Management Agreement. In a separate letter dated June 3, 1991 from BOMAT to Bridgewood, which succeeded RS & P Management as manager of the property owned by 2120 Corporate Drive, the former notified Bridgewood that it was cancelling the Management Agreement and requested that Bridgewood turn over all information relating to the property. By a letter dated August 30, 1991 from BOMAT to Addison LP, the former asserted that it was withdrawing its April 5, 1991 offer and exercised anew its rights under Article VII of the Agreement of Limited Partnership based on an updated value of the partnership property. In a separate letter dated September 6, 1991, from BOMAT to Addison LP, the former enclosed a second copy of its August 30, 1991 offer letter to the latter, noting that it had received no acknowledgment of that letter. In a letter dated September 26, 1991, from Sheridan to Burch, the former, among

other things, acknowledged receipt of the August 30, 1991 letter from BOMAT to Addison LP and asserted that BOMAT lacked the right to withdraw its April 5, 1991 offer and deemed the August 30, 1991 offer a "nullity."

By a letter dated October 16, 1991 from BOMAT to Addison LP, BOMAT notified the latter of its contention that, by its conduct, the general partner had agreed to sell its interest in the partnership pursuant to the terms and conditions asserted by BOMAT in the August 30, 1991 offer letter, based on BOMAT's interpretation of Article VII of the partnership agreement. In an exchange of correspondence between Burch and Sheridan commencing in September 1991, Burch asserted, and Sheridan contested whether the latter had been paying excessive fees to RS & P Management and Bridgewood.

### b. WC West Chicago Associates Limited Partnership

The buy-sell correspondence for WC West Chicago Associates Limited Partnership is, in all material respects, identical to the above-described correspondence relating to 2120 Corporate Drive.

### c. TC Associates Limited Partnership

The buy-sell correspondence between the parties for TCLP is, in all material respects, identical to the correspondence described for 2120 Corporate Drive. There was, however, no correspondence between the parties in this partnership relating to withdrawal of the limited partner's initial offer and a subsequent revised offer. On August 27, 1991, TC Associates Limited Partnership commenced a Chapter 11 case by filing a voluntary petition in the United States Bankruptcy Court for the Northern District of Illinois, Northern Division. During the pendency of that case, upon motion by BOSP and certain other creditors, the Bankruptcy Court entered an order appointing a Chapter 11 trustee for the partnership. The United States Trustee for the Northern District of Illinois subsequently appointed Mr. Joseph Baldi as Trustee for the partnership. Upon motion by the Trustee, the Bankruptcy Court subsequently entered an order approving the sale of all real property assets of TC Associates Limit-

ed Partnership to DTC Investments, a BOSP affiliate.

#### d. *MP Melrose Park Associates Limited Partnership*

The buy-sell correspondence between the parties for MP Melrose Park Associates Limited Partnership is, in all material respects, identical to the correspondence described above regarding 2120 Corporate Drive. There was, however, no correspondence between the parties in the partnership relating to withdrawal of the limited partner's initial offer and a subsequent revised offer.

### 2. *The Count III, Counterclaim and Third Party Partnerships*

#### a. *W65 Bedford Park Associates*

In a letter dated March 21, 1991 from BOMAT to W65LP, the former offered to purchase the latter's interest in the partnership pursuant to Article VII of the Agreement of Limited Partnership of W 65 Bedford Park Associates. BOMAT offered to purchase the general partner's interest in the partnership pursuant to certain terms and conditions set forth in the offer letter. By a letter dated June 4, 1991 from BOMAT to W65LP, BOMAT notified the latter of its contention that by its conduct, the general partner had agreed to sell its interest in the partnership pursuant to terms and conditions asserted by BOMAT based on its interpretation of Article VII of the partnership agreement. In a letter dated June 4, 1991 from BOMAT to RS & P Management, the former notified the latter that it was cancelling the Management Agreement. In a separate letter dated June 4, 1991 from BOMAT to Bridgewood, which succeeded RS & P Management as manager of the property owned by W 65 Bedford Park Associates, the former notified Bridgewood that it was cancelling the Management Agreement and requested that Bridgewood turn over all information relating to the property.

In a letter dated June 11, 1991 from Robert Sheridan to Robert D. Burch, the former responded to the latter's several letters of June 4, 1991 stating that, "We reject categorically all of your claims and demands. You have no right to terminate management contracts, and we have responded appropriately to each of your offers." In an exchange of correspondence between Burch and Sheridan commencing in September 1991, Burch asserted, and Sheridan contested, whether Sheridan had been paying excessive fees to RS & P Management and Bridgewood in breach of the express terms of the partnership agreement and management agreement.

#### b. *CG Coral Gables Associates Limited*

The buy-sell correspondence for CG Coral Gables Associates Limited is, an all material respects, identical to the above-described buy-sell correspondence for W 65 Bedford Park Associates.

#### c. *SW Associates Limited Partnership*

The buy-sell correspondence for SW Associates Limited Partnership is, in all material respects, substantively identical to the above-described buy-sell correspondence for W 65 Bedford Park Associates.

#### d. *32500 Van Born Associates Limited Partnership*

With the exception of one additional letter, the buy-sell correspondence for 32500 Van Born Associates Limited Partnership is, in all material respects, identical to the above-described buy-sell correspondence for W 65 Bedford Park Associates.

In a letter dated March 29, 1991 from BOMAT to WMLP, the former notified the latter that, since the general partner had received $140,000 in additional funding from BOMAT subsequent to the date of BOMAT's March 21, 1991 offer letter, the offer to purchase may be modified.

#### e. *601 West Polk Associates Limited Partnership*

The buy-sell correspondence for 601 West Polk Associates Limited Partnership is, in all material respects, identical to the above-described buy-sell correspondence for W 65 Bedford Park Associates.

#### f. *32500 Capitol Avenue Associates Limited Partnership*

The buy-sell correspondence for 32500 Capitol Avenue Associates Limited Partnership is, in all material respects, identical to the above-described buy-sell correspondence for W 65 Bedford Park Associates.

### g. WC Fields Limited Partnership

The buy-sell correspondence for WC Fields Limited Partnership is, in all material respects, identical to the above-described correspondence for W 65 Bedford Park Associates.

### h. Barnside Apartment Associates Limited Partnership

The buy-sell correspondence for Barnside Apartment Associates Limited Partnership is, in all material respects, identical to the above-described buy-sell correspondence for W 65 Bedford Park Associates.

### i. Newtown Associates Limited Partnership

In a letter dated August 27, 1991 from BOSP to Newtown LP, the former offered to purchase the latter's interest in Newtown Associates Limited Partnership pursuant to Article VII of the Amended and Restated Agreement of Limited Partnership of Newtown Associates Limited Partnership, as later amended. BOSP offered to purchase the general partner's interest in the partnership pursuant to certain terms and conditions set forth in the offer letter. In a separate letter dated September 6, 1991, from BOSP to Newtown LP, the former enclosed a second copy of its August 27, 1991 letter to the latter, noting that it had received no acknowledgement of that letter. In a letter dated October 2, 1991, from Robert Sheridan to Robert Burch, the former, among other things, acknowledged receipt of the August 27, 1991 offer letter from BOSP, but rejected the offer to purchase. By a letter dated October 16, 1991 from BOSP to Newtown LP, the former notified the latter of its contention that, by its conduct, the general partner had agreed to sell its interest in the partnership pursuant to the terms and conditions asserted by BOSP in the August 27, 1991 offer letter, based on BOSP's interpretation of Article VII of the partnership agreement.

### I. COMMENCEMENT OF THIS LITIGATION

On or about April 25, 1991, a few weeks after BOSP and BOMAT first notified their 13 respective general partners of the exercise by BOSP and BOMAT of their buy-sell rights, plaintiffs/counterdefendants filed this lawsuit. In Count I of the complaint, the general partners of four of the limited partnerships claim that either BOSP or BOMAT, in calculating the amount due to the general partners upon exercise of the buy-sell provisions, incorrectly applied the formula provided in the respective Agreements of Limited Partnership. They claim that, under a correct application of the formula, they are entitled to the following amounts:

### COUNT I PARTNERSHIPS

| Name of Partnership | Date of Formation | Plaintiff's Claim Under Buy–Sells |
|---|---|---|
| TC Associates Limited Partnership | 11/11/87 | $135,000 |
| 2120 Corporate Drive Associates Limited Partnership | 3/20/89 | $235,000 |
| WC West Chicago Associates Limited Partnership | 3/30/89 | $1,414,000 |
| MP Melrose Park Associates Limited Partnership | 4/03/89 | 630,000 |
| TOTAL | | $2,414,000 |

BOSP and BOMAT claim that those general partners are entitled to nothing under BOSP and BOMAT's interpretation of the Agreements of Limited Partnership.

In Count III of the Complaint, the general partners of eight of the subject limited partnerships claim that BOSP and BOMAT were not entitled to exercise their buy-sell rights in March and April 1991. Their claim is based upon the alleged existence of agreed "holding periods" which are contained in business plans for the subject limited partnerships and upon a number of other allegedly "equitable factors," including alleged subsequent verbal agreements between the parties. Sheridan asserts that the filing of the lawsuit is his response to the buy-sell letters for the Count III properties.

In the Third–Party Complaint, BOSP seeks, among other things, to enforce the Newtown Associates Limited Partnership buy-sell provision. The general partner of that partnership also claims the buy-sell was exercised prematurely. The Count III, Counterclaim and Third–Party partnerships are as follows:

### COUNT III, COUNTERCLAIM AND THIRD PARTY COMPLAINT PARTNERSHIPS

W 65 Bedford Park Associates

CG Coral Gables Associates

SW Associates Limited Partnership

32500 Van Born Associates Limited Partnership

601 West Polk Associates Limited Partnership

32500 Capitol Avenue Associates Limited Partnership

WC Fields Limited Partnership

Barnside Apartment Associates Limited Partnership

Newtown Associates Limited Partnership

### II. DISCUSSION [1]

During the bench trial in this case, this court received over 600 documents and heard two and one half weeks of testimony. Over the course of the trial, the multiple claims and counterclaims asserted in the litigation were distilled, by agreement of the parties stated in open court, into four basic disputes:

1. the parties' disagreement as to the proper method of calculating the value of the plaintiffs' interests under the buy-sell provisions for the four Count I limited partnerships;

2. the parties' disagreement as to whether the defendants could invoke the buy-sell provisions for the Count III limited partnerships in Spring 1991;

3. the defendants claim the plaintiffs have charged excessive management fees;

4. the defendants claim the plaintiffs inappropriately charged the limited partnerships for accounting services.

The defendants also seek an accounting from the plaintiffs as to the management and accounting fees. The parties also seek, due to their obviously strained relationship, what they have referred to as a "divorce," a termination of the partnership relationship.

### A. COUNT I

The parties have asked the court to determine the proper interpretation of the buy-sell provisions of their limited partnership agreements. The buy-sell provisions provide a mechanism by which one party sets a purchase price and offers to purchase the other party's partnership interest for that price. The offeree partner has the option of either selling at that price or purchasing the offeror partner's interest at the same price. The focus of the dispute is the proper calculation of the amount due to the general partners upon exercise of the buy-sell provision by the limited partners. There are four partnerships (referred to as the "Count I partnerships") involved in the Count I claim:

---

1. In the discussion section of this opinion, the several entities controlled by Robert Sheridan are collectively referred to as the "plaintiffs" or "the Sheridan entities" and the partnership entities controlled by Robert Burch are collectively referred to as the "defendants" or "the Burch entities."

| Partnership | Amount Due Plaintiffs Under Plaintiffs' Calculation | Amount Due Plaintiffs Under Defendants' Calculation |
|---|---|---|
| TC Associates Limited Partnership | $ 135,000 | 0 |
| 2120 Corporate Drive Associates Limited Partnership | $ 235,000 | 0 |
| WC West Chicago Associates Limited Partnership | $1,414,000 | 0 |
| MP Melrose Park Associates Limited Partnership | $ 630,000 | 0 |
| | $2,414,000 | $0 |

In substance, the plaintiffs seek a reformation of Section 5.3(a)(ii) to read:

5.3 *Allocation of Income, Gains, Losses, and Deductions from a Capital Transaction.*

\* \* \* \* \* \*

(ii) To the Limited Partner, to the extent of the difference between the Limited Partner's Unrecovered Capital and the balance in the Capital Account of the Limited Partner;

rather than the actual language in the four Count I partnership agreements:

5.3 *Allocation of Income, Gains, Losses, and Deductions form a Capital Transaction.*

\* \* \* \* \* \*

(ii) To the Limited Partner, to the extent of the Limited Partner's Unrecovered Capital ...

The plaintiffs assert that literally applying the language in Section 5.3 allows the defendants a windfall, a double recovery of the defendants' capital. The plaintiffs maintain that the defendants were entitled to only a single recovery; the defendants' unrecovered capital must be netted against the balance in the defendants' capital account. The defendants assert that the alleged "double recovery" was an agreed upon mechanism for accounting for the subsidy payments due the defendants.

The defendants based the calculations in their buy-sell offers on a strict reading of the literal language of the agreements, notably Section 7, Section 5.3, and Section 11.2. The defendants' calculations utilized figures taken from the partnership financial statements prepared and provided by the plaintiffs.

Plaintiffs assert two arguments as to why defendants' calculations are incorrect:

(1) Section 5.3 cannot be applied as written because the contractual provisions are ambiguous, and the provisions must be read in conjunction with other agreements in the context of the overall business relationship of the parties;

(2) Section 5.3 does not accurately reflect the parties' agreement, and the contract must be reformed on the grounds of mutual mistake of the parties.

Most of the evidence presented at trial focused on the second issue, and plaintiffs' first argument was ultimately absorbed into the second theory.

### 1. The Relevant Contract Provisions

There are several contractual provisions of the parties' agreements which are relevant to an appropriate analysis of the parties' respective arguments.

The Master Agreement provided for a general sharing of gain in Section 3(b)(ii) and (iii):

(b) Each Investment Partnership shall (x) enter into all appropriate contractual documentation required in order to acquire, operate and develop the Recommended Property described in the approved Acquisition Proposal (each Recommended Property, when so approved, being referred to herein as an "Approved Property") and (y) pay (from capital contributions and/or interim loans made thereto), to the extent and at the times set forth in the Budget, all required down payments, portions of the purchase price (if applicable), Approved Expenses and all other costs and expenses to be incurred with respect to such Approved Property. Among other matter, the Partnership

Agreement shall be consistent with the following:

\* \* \* \* \* \*

(ii) With respect to each Investment Partnership entered into, the Burch Partner shall be entitled to received a Preferred Return (such capitalized term, and each other capitalized term not otherwise defined in this subparagraph 3(b), shall have the meaning ascribed thereto by the Partnership Agreement) at the rate of ten percent (10%) per annum (compounded annually in arrears) on a cumulative basis to the extent of Distributable Cash and on a priority basis from Proceeds from a Capital Transaction.

(iii) Each Investment Partnership will contain additional provisions comparable to those set forth in Exhibit B, the general intended effect of which is that thereafter, Distributable cash will be distributed fifty (50%) percent to Sheridan and fifty (50%) percent to the Burch partner. *In the case of Proceeds from a Capital Transaction, after distribution to the Burch Partner of the Preferred Return for the applicable Investment Partnership, and recovery by the Burch Partner of its Unrecovered Capital, the balance of such Proceeds from a Capital Transaction will be distributed fifty (50%) percent to Sheridan and fifty (50%) percent to the Burch Partner.* To the extend that any additional limited partners participate in any Investment Partnership, the Burch Partner and such other limited partners shall share all distributions in the ratio of their respective Investment Participation.

(Joint Trial Exhibit No. 1) (emphasis added.)

The Master Agreement provided for a minimum investment return for the Burch partner, a "subsidy" payment relating to partnerships not paying the required Preferred Return (a defacto interest payment):

4. *Minimum Investment Return.*

Supplementing the provisions of the various Partnership Agreements relating to the Preferred Return for each Investment Partnership, *Sheridan agrees that it will not be entitled to receive any return from any Investment Partnership until the* *Burch Partner of each Investment Partnership has received a cumulative preferred yield of at least eight percent (8%) per annum (compounded annually in arrears).* It is not intended that the Subsidy Payments and repayments thereof under this Section 4 effect amounts otherwise payable to partners other than Burch and Sheridan. In order to implement this it is specifically agreed that:

(a) *If at any time there is Distributable Cash or Proceeds from a Capital Transaction (collectively "Available Cash Proceeds") from an Investment Partnership in excess of the Preferred Return but there are one or more other Investment Partnerships where the Burch Partner has not received a cumulative preferred yield of at least eight percent (8%) per annum (compounded annually in arrears) (each a "Subsidized Partnership"), the next Available Cash Proceeds otherwise payable to the Partners in excess of the Burch Partner's Preferred Return shall be paid instead pro rata to the Burch Partner(s), in each such Subsidized Partnership* (each such payment a "subsidy Payment") until each such Burch Partner has received a cumulative preferred yield of eight percent (8%) per annum (compounded annually in arrears). Any additional amounts of Available Cash Proceeds from such other Investment Partnership(s) making a Subsidy Payment shall be paid in accordance with the Partnership Agreement(s) for such Investment Partnership(s) making a Subsidy Payment and this Agreement. All Subsidy Payments provided in this Section 4(a) shall be made from Investment Partnership(s) designated by Burch. Subsidy Payments made under this Section 4(a) shall be repaid before any Subsidy Payments under Section 4(c).

(Joint Trial Exhibit No. 1) (emphasis added.)

This provision was modified by the parties, on July 31, 1988, in the First Amendment to the Master Agreement:

4. *Minimum Investment Return.*

Supplementing the provisions of the various Partnership Agreements relating to the Preferred Return for each Investment Partnership, *Sheridan agrees that it will*

*not be entitled to receive any return from any Investment Partnership until the Burch Partner of each Investment Partnership has received a cumulative preferred yield equal to at least the Preferred Return agreed to for that partnership less two percent (2%) per annum.* Said amount shall be compounded annually in arrears. It is not intended that the Subsidy Payments and repayments thereof under this Section 4 effect amounts otherwise payable to partners other than Burch and Sheridan. In order to implement this it is specifically agreed that:

(a) If at any time there is Distributable Cash or Proceeds from a Capital Transaction (collectively "Available Cash Proceeds") from an Investment Partnership in excess of the Preferred Return but there are one or more other Investment Partnerships where the Burch Partner has not received a cumulative preferred yield equal to at least the Preferred Return agreed to for that partnership less two percent (2%) per annum (compounded annually in arrears) (each a "Subsidized Partnership"), *the next Available Cash Proceeds otherwise payable to the Partners in excess of the Burch's Partner's Preferred Return shall be paid instead pro rata to the Burch Partner(s), in each such Subsidized Partnership (each such payment a "Subsidy Payment") until each such Burch Partner has received a cumulative preferred yield equal to at least the Preferred Return agreed to for that partnership less two percent (2%) per annum (compounded annually in arrears).* Any additional amounts of Available Cash Proceeds from such other Investment Partnership(s) making a Subsidy Payment shall be paid in accordance with the Partnership Agreement(s) for such Investment Partnership(s) making a Subsidy Payment and this Agreement. All Subsidy Payments provided in this Section 4(a) shall be made from Investment Partnership(s) designated by Burch. Subsidy Payments made under this Section 4(a) shall be repaid before any Subsidy Payments under Section 4(c).

(Joint Trial Exhibit No. 2) (emphasis added.)

The parties dispute the effect of this provision. Sheridan and Burch agree that the provision was intended to prevent Sheridan from receiving profit on a successful partnership while Burch was suffering accumulating, but unpaid, Preferred Returns in other partnerships. Burch testified that this section applied to any distribution as written. Sheridan testified that the subsidy would not impact distributions, but would be accounted for via adjustments in management fees.

The form limited partnership agreement provided a definition for "capital transaction":

3.7 *"Capital Transaction"* Any Partnership transaction resulting in the receipt of cash or other consideration (other than the receipt of capital contributions to the extent necessary for the uses for which it was contributed) from the sale, disposition or refinancing of any Partnership asset that is capital in nature including without limitation sales, condemnations, recoveries of damage awards and insurance proceeds (other than business or rental interruption insurance proceeds) or any borrowing or mortgage refinancing with respect to any such asset.

(Joint Trial Exhibit No. 1, Exhibit B.) The parties dispute whether a buy-sell constitutes a capital transaction.

As indicated, the most significant provision in the limited partnership agreements was Section 5.3:

5.3 *Allocation of Income, Gains, Losses and Deductions from a Capital Transaction.*

(a) The excess of income and gains over losses and deductions from a Capital Transaction shall be allocated between the General Partner and the Limited Partner for each fiscal year, or portion thereof in the following order of priority;

(i) If either or both Partners have a negative Adjusted Capital Account Balance, first to the Limited Partner to the extent of the Limited Partner's negative Adjusted Capital Account Balance and thereafter to the General Partner to the extent of the General Partner's negative Adjusted Capital Account Balance;

(ii) To the Limited Partner, to the extent of the Limited Partner's Unrecovered Capital;

(iii) To the Limited Partner, to the extent of the Limited Partner's Preferred Return; and

(iv) Thereafter 50% to the General Partner and 50% to the Limited Partner.

(b) The excess of losses and deductions over income and gains from a Capital Transaction shall be allocated 50% to the General Partner and 50% to the Limited Partner.

(Joint Trial Exhibit 1, Exhibit B.)

The buy-sell provisions themselves were contained in Section 7 of the limited partnership agreements:

7.1 *General.* Either Partner may at any time make an offer of purchase and sale to the other Partner on the terms and conditions set forth herein.

7.2 *Determination of Purchase Price.* The offer shall be in writing and specify a value for the Property and other items of Partnership Property, other than cash, cash equivalents, receivables, prepaid items and the like. The offer shall provide that the offeror or his designee will purchase the partnership interest of the other partner at a price equal to the amount *that the offeree partner would receive on liquidation of the Partnership if the Property were sold at the specified price* taking into account normal prorations of receivables, payables, prepaid expenses and deferred charges with respect to the Property, all liabilities of the Partnership paid, and the remaining assets distributed to the Partners in accordance with this Agreement. If, within ten (10) days after submitting the offer, the offeror Partner has not received written communication from or had a conversation with the offeree Partner acknowledging or regarding the offer, a second copy of the offer shall be sent to the offeree Partner by Federal Express or a similar overnight courtier service. In the event the General Partner is the offeror, he shall provide in his offer a certified and complete disclosure of any material facts relating to the value of the Property and other items of Partnership Property, other than cash, cash equivalents, receivables, prepaid items and the like and the partnership interest which it has not previously disclosed in writing to the Limited Partner. In the event the Limited Partner is the offeror, the General Partner shall provide such disclosure with ten (10) days of receipt of the offer and the Limited Partner shall then have ten (10) days after receipt of such disclosure to revise its offer if any new information materially affecting value was received. Upon making or receiving an offer, the General Partner shall cause the Partnership's accountants promptly to determine the amount of the Partnership's assets (other than the Property) net of liabilities in accordance with the accounting procedures and practices previously followed by the Partnership, with the view that the combined value of the partnership interests of the General Partner and Limited Partner shall be equal to the value placed on the Property by the Offeror plus the amount of the other assets of the Partnership less the liabilities of the Partnership as reflected in its books. Any delay in determining the amount of the Partnership's assets and liabilities or the purchase price shall not increase the period within which the election required by Section 7.3 must be made. After an offer has been made, the Partnership shall not enter into any leases for periods longer than six (6) months or any other material contracts without the approval of both the General Partner and the Limited Partner.

7.3 *Right of Offeree.* Within forty-five (45) days following the offer or thirty (30) days following the revised offer (or, in the event the Limited Partner is the offeree, within sixty (60) days following the date of the offer), the offeree Partner shall elect either (i) to sell its Partnership interest to the offeror Partner or its designee for the purchase price for such interest determined as provided in Section 7.2, or (ii) to elect to purchase from the offeror Partner its Partnership interest for the purchase price so determined. The offeree Partner may designate any affiliate or designee of said Partner to purchase on its behalf.

Absent an affirmative election by the offeree Partner, the offeree Partner shall be deemed to have elected to sell its Partnership interest to the offeror Partner or its designee.

(Joint Trial Exhibit 1, Exhibit B) (emphasis added.)

The limited partnership agreements provided for the distribution of cash in Section 5.5:

5.5 *Division of Distributions of Distributable Cash.*

(a) Distributable Cash attributable to each Partnership fiscal year (other than proceeds from a Capital Transaction) shall be divided between and paid to the Partners in the following order of priority:

(i) To the Limited Partner, up to the amount of the Preferred Return of the Limited Partner.

(ii) Thereafter, 50% to the Limited Partner and 50% to the General Partner.

(b) Proceeds from a Capital Transaction shall be divided up and paid to the Partners in the following order of priority:

(i) First to the Limited Partner, up to the amount of the Preferred Return of the Limited Partner.

(ii) Next, to the Limited Partner, up to the amount of the Unrecovered Capital of the Limited Partner.

(iii) Thereafter, 50% to the General Partner and 50% to the Limited Partner.
(Joint Trial Exhibit No. 1, Exhibit B)

The limited partnership agreements provided for winding up and liquidation in Section 11.2:

11.2 *Winding Up and Liquidation.*

(a) Upon the dissolution of the Partnership the General Partner (or another party designated by the Limited Partner) shall cause the Partnership assets to be sold.

(b) Upon the winding up and termination of the business and affairs of the Partnership, its assets (other than cash) shall be sold, its liabilities and obligations to creditors and all expenses incurred in its liquidation shall be paid or provided for, *and all resulting items of Partnership income, gain, loss or deduction shall be credited or charged to the capital accounts of the Partners in accordance with the principles of Article V of this Agreement.* During said same time period, the net proceeds from such sales and all other assets of the Partnership shall be distributed among the Partners in the following order of priority:

(i) First, to the payment and discharge of all of the Partnership's debts and liabilities, excluding liabilities to Partners, except the claims of secured creditors whose obligations will be assumed or otherwise transferred upon liquidation of the Partnership's assets;

(ii) Second, to establish any reserves which the General Partner (or other liquidating party) may deem necessary, appropriate or desirable for any future, contingent or unforeseen liabilities, obligations, or debts of the Partnership or of the General Partner arising out of or in connection with the Partnership which are not yet payable or have not yet been paid. Such reserves shall be paid over by the General Partner to an independent escrow holder at the request of the Limited Partner, to be held by it for the purpose of disbursing such reserves in payment of any of such liabilities, obligations and debts and, at the expiration of such reasonable period as the General Partner shall deem necessary, to distribute the balance thereafter remaining in the manner provided below;

(iii) Third, to the payment and discharge of all the Partnership's debts and liabilities to Partners to the extent permitted by law;

(iv) Fourth, to the Partners in accordance with the positive balances in their capital account by the end of the taxable year in which the liquidation occurs (or, if later, within ninety (90) days after the date of the Partnership's liquidation).

(Joint Trial Exhibit No. 1, Exhibit B) (emphasis added.)

2. *Plaintiffs' Ambiguity Theory*

The plaintiffs' initial theory is that the provisions of the limited partnership agreements are ambiguous and therefore must be

interpreted by the court in the context of the overall business deal. As this theory was largely absorbed within the mutual mistake theory at trial, the court will address it only briefly.

The plaintiffs have repeatedly conceded that the defendants' *calculations are in conformity with the literal language of Section 5.3;* this section is quite clear and utilizes defined terms. The plaintiffs' ambiguity argument focuses on alleged conflicts between Section 5.3 and other provisions of the agreements, notably Section 3(b)(iii) of the Master Agreement and Section 5.5 of the limited partnership agreements. The plaintiffs also tentatively suggest a buy-sell transaction may not be a capital transaction. The plaintiffs' arguments are unpersuasive.

A "Capital Transaction" is defined in Section 3.7 of the respective limited partnership agreements:

> "Any Partnership transaction resulting in the receipt of cash or other considerations (other than the receipt of capital contributions to the extent necessary for the uses for which it was contributed) *from the sale,* disposition or refinancing of any partnership asset that is capital in nature *including without limitation sales,* condemnations, recoveries of damage awards and insurance proceeds (other than business or rental interruption insurance proceeds) or any bonding or mortgage refinancing with respect to any such asset."

(emphasis added.)

Further, Section 7.2, relating to the determination of the purchase price in a buy-sell transaction, specifically provides that the offeree partner would purchase the partnership at a "price equal the amount that offeree partner would receive on liquidation of the partnership if the Property were *sold* at the specified price." (emphasis added.)

Under the terms of the agreements, a buy-sell transaction would clearly constitute a capital transaction. The provisions of Section 5.3(a) relating to allocation of gain for a capital transaction and Section 5.5(b) relating to the distribution of proceeds of a capital transaction are substantially identical. There appears to be no conflict.

The plaintiffs next argue that Section 5.3 must be in conformity with Section 3.b of the Master Agreement. Section 3.b(iii) of the Master Agreement provides that proceeds from a capital transaction will be distributed to the Burch Partner to cover preferred returns, then to the Burch Partner to the extent of the Burch Partner's unrecovered capital, and then the balance is to be distributed 50/50 to each partner. The plaintiffs assert that there is no reference to *required subsidy payments* in Section 3. Therefore, under plaintiffs' theory, Burch is not entitled to such payments from the proceeds of a capital transaction. This argument is not persuasive, as the various limited partnership agreements were intended to *implement the entire* Master Agreement, including Section 4 relating to minimum investment return, not just Section 3. Section 4 will be discussed in detail later.

### 3. *Contract Reformation*

The standard for contract reformation under Illinois law was recently stated by the Seventh Circuit in *Board of Trustees of the University of Illinois v. Insurance Corporation of Ireland, Ltd.,* 969 F.2d 329, 332 (7th Cir.1992):

> "Reformation of a contract should only be allowed when clear and convincing evidence compels the conclusion that the instrument as it stands does not properly reflect the true intention of the parties, and that there has been either a mutual mistake or a mistake by one party and fraud by the other."

The Illinois Supreme Court in *Zannini v. Reliance Insurance Company of Illinois, Inc.,* 147 Ill.2d 437, 168 Ill.Dec. 820, 825, 590 N.E.2d 457, 462 (1992) addressed this issue and stated:

> "[I]n order for a court to reform an instrument on the grounds of mistake, the mistake must be of fact and not law, mutual and common to both parties, and in existence at the time of the execution of the instrument showing, that at such time the parties intended to say a certain thing, and, by a mistake, expressed another."

██ Applying these principles, it is clear that the purpose of reformation is to make a contract express the agreement the parties intended when the parties, having attempted to reduce their agreement to writing, fail to express their agreement correctly. *Board of Trustees,* 969 F.2d at 332. If applied too liberally, however, reformation can cause more harm than good. *Id.* Therefore, a plaintiff seeking reformation is required to prove the need for reformation by clear and convincing evidence. *Id.* Clear and convincing evidence has been defined in Illinois law as "the quantum of proof which leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question." *Parker v. Sullivan,* 891 F.2d 185, 188 (7th Cir.1989).

The plaintiffs have made several arguments in favor of their interpretation of the contract:

a. the defendants' view is in contravention to the reality of the underlying business deal;

b. the phantom income (subsidy) issue has been overstated by the defendants, and the plaintiffs believed changes made in Section 5.3 during negotiations were purely technical;

c. the amendments in later partnership agreements indicate the intended structure of Section 5.3;

d. the plaintiffs' officers and attorneys did not have authority to amend or endorse the agreements as written.

The plaintiffs, however, have not met their burden of proof as to any of these arguments.

### a. *"Business Reality"*

██ The plaintiffs argue that it is patently absurd that the plaintiffs receive nothing via the buy-sell provisions. The plaintiffs assert that such a result would be completely contrary to the business reality of the transaction intended by the parties. The plaintiffs argue that the defendants' interpretation of the contractual provisions allows them a "double" recovery of their capital, an unanticipated and inequitable financial windfall.

Plaintiffs assert that realizing profit from the sale of the property, either to a third party or via a buy-sell, was the plaintiffs' only hope for profit. Plaintiffs assert that, under the defendants' formulation, only under the most advantageous market conditions would the plaintiffs receive any profit. Plaintiffs point out that management fees were intended to cover costs and not serve as a profit source for the plaintiffs. The plaintiffs argue it is ludicrous to believe a skilled businessman like Sheridan would enter into an agreement from which he would receive no profit.

The defendants have responded with several arguments. First, defendants assert the arrangement logically reflects the business deal and was structured as it was because the Burch entities provided all the capital and were exposed to all the risk. Second, the gain was shifted to the Burch entities due to Sheridan's concerns about "phantom income" that may result under the subsidy agreement. (This issue is discussed in the next section.) Third, in the event that the buy-sell provisions worked an inequity, Burch would provide suitable compensation for Sheridan in an accounting at "the end of the road."

The defendants' third argument will be addressed first. Burch testified to the effect that he would provide an informal "accounting" to Sheridan, if necessary, at "the end of the road" (the ultimate termination of their business relationship). Burch further testified that he viewed the "accounting" as a moral obligation rather than a legally binding contractual obligation. On cross-examination, Burch also testified that there was no written memoranda summarizing this "obligation". Nor was there a mechanism, given Burch's age, that a successor trustee to Burch would be made aware of the obligation. On cross-examination, Burch was asked how the "end of the road" accounting would operate if the end of the road were today and the buy-sell transactions involving the four Count I partnerships were the only relevant transactions. Burch had no meaningful response.

Defendants' "end of the road accounting" argument is unpersuasive. As argued by the

plaintiffs, it is innately unlikely that two men in their sixties would agree to delay settling their accounts until the end of a relationship that could easily last a decade or more, especially since some of the business plans for the partnerships had extended time horizons.

The defendants' first argument, however, that the parties agreed to allow the defendants to receive the bulk of the benefits because defendants provided all the capital, is persuasive. The entire partnership arrangement envisioned the defendants providing the capital and the plaintiffs providing management expertise. The undisputed testimony of the defendants establish that they have invested on the order of forty million dollars in the partnerships and are owed over twelve million dollars in preferred return payments. This is substantial financial exposure.

As to the specific Count I partnerships, as shown below, all the capital had been provided by the defendants and the preferred return due on each is substantial.

| | Total Unrecovered Capital of Limited Partner | Unpaid Preferred Return |
|---|---|---|
| TC Associates [2] Limited Partnership | 3,160,000.00 | 1,685,556.53 |
| 2120 Corporate Drive Associates Limited Partnership | 404,794.52 | 152,082.22 |
| WC West Chicago Associates Limited Partnership | 2,901,010.27 | 756,050.96 |
| MP Melrose Park Associates Limited Partnership | 2,876,517.00 | 1,331,290.00 |

That the party who contributed the capital in an investment transaction would receive the bulk of the gain upon sale of the investment is hardly ludicrous from a business standpoint. Nor is it ludicrous that someone who provided all the capital would receive all the gain. That a party who manages the properties, but contributes no capital, would receive gain only if there are sufficient increases in the properties' value is reasonable. Incentive bonus systems are common in business.

The entire business arrangement was structured by the parties with an eye toward protecting the defendants' capital. The Guarantee Agreement attempted to set a floor for Burch's ultimate exposure, as did the Indemnity Agreement. The Minimum Return/Subsidy provision (Master Agreement, Section 4) provided preference payments to the defendants, and provided that plaintiffs would receive *nothing* until the defendants had received a certain minimum return. The preferred return provisions themselves (Master Agreement, Section 3) provided defacto interest on the defendants' large capital contributions. The buy-sell provisions themselves provide a security mechanism for the defendants; they had the opportunity to buy or sell out of the business relationship at any time.

The plaintiffs further argue that the memoranda prepared by the parties indicate that the plaintiffs' understanding of the underlying business transaction is the correct one. The plaintiffs especially stress three memoranda prepared by Burch in early 1989 (referred to by plaintiffs as the "Burch Trilogy"). These memoranda, the so-called "Burch trilogy", however, are not nearly as probative as the plaintiffs attempt to assert. The Burch memorandum of February 11,

2. Figures taken from Defendants' Exhibit No. 320 and undisputed by plaintiffs. All figures correct as of July 31, 1992, with two exceptions. The unrecovered capital figure for TC Associates is reduced by a $1,640,000 payment made on August 25, 1992. The preferred return for TC Associates is as of July 31, 1991.

1987, Defendants' Exhibit No. 111, in sum seems more to support the defendants' position. The Burch memorandum of March 16, 1987 (Trial Exhibit No. A–9) is sufficiently vague to comport with either parties' view. The Burch memorandum of March 13, 1987 (Plaintiffs' Exhibit No. 86), actually supports the defendants' position by noting in a summary regarding the minimum investment return:

"that before Sheridan can receive *any return from an investment partnership,* the Burch partner must have received at least 8% (compounded annually in arrears) from each other partnership." (emphasis added.)

Moreover, the plaintiffs were far from uncompensated in these transactions. The plaintiffs received a variety of fees in conjunction with the properties, including management fees, acquisition fees, and leasing commissions. Indeed, it is uncontested that plaintiffs also received *several* million dollars in management fees from the partnerships. The fee arrangements generated six figure salaries for Sheridan and his top officers and substantial salaries for several members of Sheridan's family. These individuals also received a variety of "perks", including air travel. Substantial salaries and benefits are not unreasonable compensation for managing property, even without profit sharing.

The business deal, as it functions in the context of the Count I partnerships, is not so unreasonable as to convince this court, under the clear and convincing evidence standard, that a mistake has been made. That the agreement could work a potential business harshness, as alleged by the plaintiffs, is not persuasive. This agreement was made by sophisticated business people that were represented by experienced legal counsel. That plaintiffs may have anticipated the properties being sold in more advantageous market conditions, hence a higher buy-sell price and more profit to the plaintiffs, is ultimately irrelevant. "Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357 (7th Cir.1990). After parties have negotiated a contract, they are not obliged "to become an altruist toward the other party and relax the terms." *Market Street Associates Limited Partnership v. Frey,* 941 F.2d 588, 594 (7th Cir.1991).

### b. *Phantom Income*

A good deal of the parties' dispute focuses on the issue of what has been called "phantom income," and the effect of the subsidy provision set forth in Section 4 of the Master Agreement. According to the plaintiffs, a "phantom income" problem would occur if gain were allocated to the plaintiffs and the plaintiffs were required to pay the amount of the gain to the defendants as a subsidy. The plaintiffs would be taxed for gain they would not be permitted to keep under the terms of the agreements.

The plaintiffs maintain that the subsidy provisions in Section 4 of the Master Agreement does not impact upon the gain allocation provisions of Section 5.3 of the limited partnership agreements. The plaintiffs allege that the payment of any necessary subsidies would be effectuated via manipulating management fees.

Section 4(d) provides for the adjustment of management fees:

(d) The payments required under this Section 4 shall be accomplished by adjusting the Management Fee to each affected Investment Partnership as follows: (i) the Available Cash Proceeds in excess of the Preferred Return under Section 4(a) to the extent of the Subsidy Payment shall be paid to the Manager as an increased Management Fee from the Investment Partnership making the Subsidy Payments and the Subsidy Payments to Burch under Section 4(a) shall be reflected in a reduced Management Fee to the Subsidized Partnership; (ii) amounts to be repaid under Section 4(b) shall be accomplished by an increase in the Management Fee to the former Subsidized Partnership and a reduction in the Management Fee to the Investment Partnership(s) which made the Subsidy Payment(s); (iii) if Section 4(c) is applicable, the Management Fee shall be adjusted or another method mutually agreed by both parties shall be employed to implement such Subsidy Payments and

the Partnership Agreements of the Investment Partnerships making and receiving a Subsidy Payment shall each be appropriately amended. It is the intention of the parties (a) because the Investment Partnership's taxable income and loss is (generally) allocated in proportion to distributions, *these Partnership Amendments will not result in the recognition of taxable income by Sheridan which is not matched by corresponding cash distributions and which would not otherwise be recognized by Sheridan under the terms of the Partnership Agreement in effect prior to such amendment and (b) the Partnership Amendment(s) contemplated hereby will not affect the ability of the Investment Partnership(s) to maintain completely separate accounts for federal income tax reporting purposes.* However, regardless of whether or not such amendments are agreed to by the parties, any required Subsidy Payments shall be made as provided for in Section 4(c).

(Joint Trial Exhibit No. 1) (emphasis added.)

The plaintiffs also argue that they believed Section 5.3 merely contained "technical" tax language that comported with plaintiffs' understanding of the business deal. The plaintiffs argue that the defendants' position is ridiculous, as it has the plaintiffs giving away $1.00 of income to save $.35 in tax.

The defendants maintain that adjustment of management fees was only part of the "phantom income" puzzle. Defendants argue that Section 5.3 of the limited partnership agreements was also part of the solution, as consistent with Section 4 of the Master Agreement which provides that Sheridan shall not be entitled to receive any return from any partnership until Burch has received a set preferred yield in each partnership. The defendants maintain the "phantom income" problem was a very real issue to Sheridan, and the agreements accommodated his concerns as well as possible. The defendants stress the issue was not Sheridan giving away $1.00 of income to save $.35 tax, but avoiding $.35 tax on a $1.00 he was not allowed to keep.

A good part of the difficulty in evaluating the documents is due to the fact that, due to special considerations, they are deliberately oblique. As the testimony indicates, the agreements had to meet several, somewhat contractory goals:

—to maintain each partnership as a separate, self-standing entity for tax purposes;

—to comply with internal revenue service regulations that *allocated* gains reflect the financial reality of any transaction;

—shield Sheridan from phantom income;

—provide for the subsidy payments between partnerships that may be necessary.

The subsidy provision, which provided for payments from one partnership to another was especially challenging. The Master Agreement provided for the subsidy to be paid *between* partnerships, but, given the requirement the limited partnerships had to be stand alone entities, the limited partnership agreements could not *explicitly* provide for such payments. Further, the respective provisions also had to appropriately allocate, in conformity with the tax law, the gain inherent in the subsidy payment to the limited partner. The defendants have testified that to accommodate these conflicting goals, it was ultimately decided to provide for the payment of the subsidy, and the allocation of gain, *indirectly*.

The early drafts of the limited partnership agreements, which attempted to deal with the problem directly, are probative:

5.04 *Allocations of Income and Gain from Capital Transactions.*

(A) All items of income and gain of the Partnership in connection with Capital Transactions of the Partnership shall be allocated (prior to making any distributions pursuant to Section 5.09 with respect to the Capital Transaction in question) in the following order of priority:

(i) first, if the Capital Account of any Partner has a negative balance, such items of income and gain shall be allocated to such Partner or Partners whose Capital Account has a negative balance in the ratio of such respective negative balances, until the balance of each such

Partner's Capital Account is equal to zero;

(ii) second, to the Limited Partner until the Capital Account of the Limited Partner equals the sum of the Limited Partner's Net Capital Investment, any accrued but unpaid Limited Partner Preferred Return *[ (less any portion thereof representing Payments from Related Partnerships) plus the aggregate amount of Related Partnership Distributions to be made with respect to the transaction in question [until the Limited Partner has received the Related Partnership Minimum Return and the Failed Transaction Amount with respect to all Related Partnerships];*

(iii) third, to the General Partner, the minimum amount necessary to make the Capital Account of the General Partner equal to the excess, if any, of the Capital Account of the Limited Partner over the sum of the Net Capital Investment of the Limited Partner, the Limited Partner Preferred Return [ (less any portion thereafter representing Payments from Related Partnerships) plus the aggregate amount of Related Partnership Distributions theretofore made]; and

(iv) thereafter, fifty (50%) percent to the Limited Partner and fifty (50%) percent to the General Partner.

(B) Losses realized by the Partnership in connection with Capital Transactions shall be allocated as follows:

(i) first, if the Capital Account of either Partner has a positive balance, such loss shall be allocated to the Capital Account of either such Partner or Partners whose Capital Account has a positive balance in the ratio of such respective positive balance, until the balance of each such Parties in Capital Account is reduced zero;

(ii) thereafter, the balance, fifty (50%) percent to the Limited Partner and fifty (50%) percent to the General Partner.

(Defendants' Exhibit No. 10) (emphasis added.)

This draft, prepared by Sheridan's Skadden Arps attorneys, dated January 12, 1987, dealt with the subsidy payments explicitly in the gain allocation provision. This direct approach was ultimately rejected, as it would prevent the partnerships from being stand alone entities, which would potentially result in multiple audits and create needless complexity.

These difficulties were summarized in a memorandum prepared by Watson of Skadden Arps, dated February 9, 1987. (Defendants' Exhibit No. 25.) The memorandum, attached to a draft of the limited partnership agreement which contained an updated Section 5.3 (in its present form), includes a discussion on proposed deal structures:

The proposals for the basic deal structure include (1) a master limited partnership acting as partner in each investment partnership; (ii) individual partnerships having centralized partnership accounting and capital accounts; or (iii) totally discrete investment partnerships with "subsidy" payments to be made pursuant to Master Agreement but not taken into account in partnership accounting (present structure). Burch's problems with (i) and (ii) above are (x) multiple audit possibility and (y) complexity. Sheridan's problem with (iii) above is possibility of paying income tax on partnership distributions which are required to be paid to Burch as part of subsidy payments (see "Tax Issues" below).

The memorandum described Sheridan's tax problem:

"To the extent that Sheridan entity is distributed cash (on which it pays tax) from one partnership, which it is obligated to pay over to a Burch entity partner of another partnership, such payment may not be deductible by Sheridan, leaving it with current tax on cash which it does not retain."

(Defendants' Exhibit No. 25.)

Sheridan was aware of the possibility, as indicated in a handwritten note which queried:

"What happens if we sell for 7.0—I owe Burch 4.0—but he wants all of it—to cover his pfd yield?"

(Defendants' Exhibit No. 46.)

The difficulty in allocating the subsidies as gain to Burch, while retaining the stand

alone character of the partnerships, lead the parties to attempt an approximation. Burch has testified as to the solution. To approximate the impact of the subsidy in Section 5.3, Burch was allowed to recover his entire unrecovered capital in each partnership (rather than unrecovered capital less the amount in his capital account for the partnership). This permitted the parties to allocate an amount approximately equal to the gain attributable to the subsidy payments to Burch, while retaining independent accounts for the partnerships. No reference to the subsidies was present in the agreements of limited partnership, but their impact was approximated by this indirect means.

While Section 5.3 allocated the equivalent of the subsidy payments between the general partners and limited partners, Section 4(d) provided for the payments in the individual partnerships' accounting records. A limited partnership receiving a subsidy recorded it as a decreased management fee, while a partnership paying a subsidy recorded it as an increased management fee. Section 4(d) also states that it is intended to comply with two goals; avoid phantom income to Sheridan and not effect the stand alone status of the partnerships.

The plaintiffs have argued that this formulation is not correct and that Section 4(d) is the only provision relevant to the subsidy and "phantom income." This position is unpersuasive. First, during the course of trial, plaintiffs largely retreated from their earliest position that "phantom income" was a "nonissue." Plaintiffs ultimately conceded "phantom income" was negotiated and repeatedly discussed. Second, plaintiffs' officers, including Sheridan and Lederer, *ultimately conceded that Section 5.3 represented part of the solution* to the "phantom income" problem. A very probative document is a file memorandum prepared by Lederer, a Sheridan officer and attorney. (Defendants' Exhibit No. 79). This memorandum, dated April 20, 1987, summarizes Lederer's understanding of the Master Agreement. The memorandum, in a section titled "Minimum Investment Return", provides

> "We receive no return from any investment partnership until Burch receives a cumulative preferred return of at least 8% per annum on the aggregate of its outstanding equity. The mechanics of subsidies *between the partnerships are complicated, and most of the bookkeeping is done by raising or lowering our management fee.* This is done for tax purposes. To the extent that available cash proceeds from any nonperforming partnership is less than 80% of the amount reflected in the Acquisition Proposal given to Burch, then the mechanics of the subsidy are changed to our detriment (page 14)."

> "The allocation of tax losses is intended to be generally in proportion to cash distributions (page 15)."

(Defendants' Exhibit No. 79) (emphasis added.)

This memorandum supports the defendants' position that the subsidy *does* effect the Sheridan return under Section 5.3. The memorandum also supports the defendants' position that the adjustment of the management fees was for bookkeeping purposes rather than the sole mechanism for actually paying the subsidy.

Perhaps most significant, the relevant drafts of the agreements were processed by Sheridan's legal counsel from the Skadden Arps law firm. It is unpersuasive for the plaintiffs to argue they did not understand the tax significance of provisions reviewed by their retained Skadden Arps tax attorneys.

### c. Variance in Limited Partnership Agreements

The plaintiffs place great weight on the fact that the language of Section 5.3(a)(ii) was different in certain limited partnership agreements.

In the first ten partnerships,[3] formed between April 27, 1987 and June 29, 1989, the

---

**3.** The partnerships were W65 Bedford Park Associates (formed April 27, 1987), CG Coral Gables Associates Limited (August 16, 1987), TC Associates Limited Partnership (November 11, 1987), SW Associates Limited Partnership (April 29, 1988), 32500 Van Born Associates (December 31, 1988), 2100 Corporate Drive Associates Limited Partnership (March 20, 1989), WC West Chicago Associates Limited Partnership (March 30, 1989), MP Melrose Park Associates Limited Partnership

language of Section 5.3(a)(ii) was in the standard form:

> "To the Limited Partner, to the extent of the Limited Partner's Unrecovered Capital."

All of the Count I partnerships contain this language.

In subsequent partnerships, the Section 5.3 language varied.

The North Avenue Limited Partnership, formed on December 1, 1989, contained the language:

> "To the Limited Partners, proportionately in accordance with the Limited Partners' Ratios, to the extent of the difference between the Limited Partner's Unrecovered Capital and the balance in the Capital Account of said Limited Partner."

The Newton Associates Limited Partnership, formed December 11, 1989, contained language identical to that in the North Avenue Limited Partnership.

The Tampa Limited Partnership, formed January 1, 1990, contained the language:

> "To the Class B Limited Partners, to the extent of the difference between the Class B Limited Partners' Unrecovered Capital and the balance in the Capital Account of the Class B Limited Partners."

The West Chicago II Limited Partnership, formed on January 1, 1990, contained identical language.

The WC Fields Limited Partnership, formed January 24, 1990, contains the language:

> "To the Limited Partner, to the extent of the difference between the Limited Partner's Unrecovered Capital and the balance in the Capital Account of the Limited Partner."

The last partnership formed by the parties, Barnside Apartment Associates Limited Partnership, formed on May 29, 1990, reverted back to the original language:

> "To the Limited Partner, to the extent of the Limited Partner's Unrecovered Capital."

(April 3, 1989), 601 West Polk Associates Limited Partnership (April 6, 1989), and 32500 Capital

The plaintiffs argue that the changes in language provide definitive proof as to the mutual mistake of the parties. The plaintiffs argue that the changes indicate the parties correcting the unintended potential windfall inherent in the first formulation of Section 5.3. The reversion to the original language in the Barnside Agreement was an attempt by the defendants to recapture the windfall. These arguments are not persuasive.

The defendants have persuasively argued that the reason the language varied in some of the later limited partnership agreements was due to the fact third party investors were expected to invest in these partnerships. The Master Agreement provides in Section 4, dealing with subsidy payments, that:

> "It is not intended that the Subsidy Payments and repayments thereof under this Section 4 effect amounts otherwise payable to *parties other than Burch and Sheridan.*"

(emphasis added.) As the subsidy provisions did not apply to other partners, the subsidy approximation, letting the limited partner recover their entire unrecovered capital, would provide any third party partner with a windfall in contravention to the Master Agreement. This necessitated a variance in the language *to remove the approximation.*

The plaintiffs' assertion about the reversion to the original language in the Barnside partnership is likewise unpersuasive. The defendants presented into evidence the draft of the agreement where the change was made. (Defendants' Exhibit No. 183.) The reversion to the original language was performed by Mr. Miselman ("Miselman"), *the plaintiffs' attorney from D'ancona & Pflaum.* That the defendants would use the plaintiffs' own attorney to improperly change the agreement is not credible.

d. *Lack of Authority/Failure to Read*

A good deal of the testimony presented by the plaintiffs revolves around two issues:

(i) many of Sheridan's officers, and Sheridan, himself, often failed to read the documents they were signing; and

Avenue Associates Limited Partnership (June 29, 1989).

(ii) several of the Sheridan officers that negotiated and signed documents had no authority to do so.

■ These arguments are thoroughly unpersuasive. It is an axiom of contract law that a party has a duty to read the contract and it is no defense to say "I did not read what I was signing." *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1292 (7th Cir.1989). Further, failure to read the terms of a negotiated contract does not rise to the level of mutual mistake necessary for contract reformation. *Harris Bank Naperville v. Morse Shoe, Inc.*, 716 F.Supp. 1109, 1121 (N.D.Ill.1989).

■ The lack of authority argument also falls flat. The parties whose authority is questioned in Sheridan's testimony include: Bruce Kinney ("Kinney"), one of Sheridan's top ranking officers; Joseph Tassi ("Tassi"), Sheridan's chief accountant and vice-president; Lederer, Sheridan's in-house counsel and vice-president; and Miselman of D'ancona & Pflaum, one of Sheridan's attorneys. All of these individuals, who were involved throughout the negotiating process, easily had, at minimum, apparent, if not actual, authority to execute and negotiate the agreements. As discussed in earlier sections, plaintiffs' argument is even less persuasive when one considers the drafts of the agreements were reviewed by Sheridan's Skadden Arps attorneys.

### e. *Summary*

■ To obtain contract reformation, the plaintiffs are required to prove that the parties made a mutual mistake. The plaintiffs must prove this by clear and convincing evidence. They have failed to do so.

The plaintiffs and defendants are skilled business people. They engaged in protracted negotiations. The dollar amounts involved were in the millions. All parties were represented by legal counsel; Burch and his interests were represented by Gibson Dunn & Crutcher, and Sheridan by Skadden Arps, D'ancona and Pflaum, and Lederer. All parties lived with the agreements for a number of years. The documents and testimony, taken as a whole, do not favor the plaintiffs' position.

■ Mutual mistake is unlikely where the agreements involve multimillion dollar transactions between sophisticated parties dealing at arm's length and represented by counsel. *Chimart Associates v. Paul*, 66 N.Y.2d 570, 573, 498 N.Y.S.2d 344, 347, 489 N.E.2d 231, 234 (1986).

### B. *COUNT III*

The plaintiffs assert that the defendants could not exercise the buy-sell provisions with respect to the Count III partnerships in Spring 1991.

The respective agreements of limited partnership each contain the following buy-sell language in Section 7.1:

> "*General.* Either Partner may at any time make an offer of purchase and sale to the other Partner on terms and conditions set forth herein."

The plaintiffs claim that a superseding agreement between the parties, and equitable considerations, prevented defendants from exercising their buy-sell rights in Spring 1991 despite the existence of the "at any time" language in Section 7.1.

The plaintiffs originally advanced three theories as to why the defendants could not exercise their buy-sell rights:

1. Forbearance Agreement: Plaintiffs' first theory is that defendants allegedly agreed in a May 14, 1990 meeting not to exercise their buy-sell rights on the Count III partnership in exchange for plaintiffs' agreement not to exercise plaintiffs' buy-sell rights on the Count III partnership until late 1992;

2. Equity: Plaintiffs' second theory is that defendants in Spring 1990 allegedly inequitably lead plaintiffs to believe defendants would make a loan to the plaintiffs if plaintiffs refrained from selling certain properties until late 1992;

3. Business Plans: Plaintiffs' third theory is that the specific holding periods in the limited partnership agreements' business plans control over the "at any time" language

in Section 7 of the limited partnership agreements.

The plaintiffs abandoned their third theory during the course of the trial. The court will address plaintiffs' other two theories.

### 1. Existence of a Forbearance Agreement

■ Plaintiffs maintain that, on May 14, 1990, plaintiffs and defendants entered into an oral agreement to hold the Count III partnerships until late 1992. Plaintiffs argue that this agreement effectively prevented defendants from exercising the buy-sell rights in the respective partnerships in Spring 1991.

■ The plaintiffs, who assert breach of the alleged oral forbearance agreement, bear the burden of proving the existence of the agreement, and every material term of the agreement. *Vandevier v. Mulay Plastics, Inc.*, 135 Ill.App.3d 787, 90 Ill.Dec. 558, 562, 482 N.E.2d 377, 381 (1985); *see also, Trittipo v. O'Brien*, 204 Ill.App.3d 662, 149 Ill.Dec. 505, 561 N.E.2d 1201 (1990) *cert. den.* 136 Ill.2d 555, 153 Ill.Dec. 385, 567 N.E.2d 343 (1991); *Lal v. Naffah*, 149 Ill.App.3d 245, 102 Ill.Dec. 806, 808, 500 N.E.2d 699, 701 (1986). The terms must be shown to be definite and certain. *Id.* A court will decline to enforce a contract that is too indefinite to be meaningfully evaluated. *U.S. v. ORR Const. Co.*, 560 F.2d 765, 769 (7th Cir. 1977). A binding agreement can only be made by mutual consent of the parties; no binding agreement can be based on one parties' unilateral assumption. *Cohen v. Washington Mfg. Co., Inc.*, 80 Ill.App.3d 1, 35 Ill.Dec. 252, 253, 398 N.E.2d 1202, 1203 (1979).

Sheridan and Kinney testified that, on May 14, 1990, they and Burch had several conversations during the course of a day of meetings regarding the sale of a large portion of partnership properties. The sale was to be handled through Grubb & Ellis Institutional Investment Group ("Grubb & Ellis"). According to Sheridan and Kinney, the conversations took place during tours of Chicago area partnership properties, at office meetings, during cab rides, and in the lobby of the hotel where the parties had dinner. Sheridan was apparently in difficult financial condition at the time, and he believed the sale was essential to provide him with the cash necessary for business survival. According to Sheridan, Burch declined to approve the sale, with the exception of the Elizabeth, New Jersey property. Sheridan maintains Burch refused to sell for two reasons: (1) a sale would impair the tax planning of the Burch entities; and (2) Burch believed the market would become much more favorable as the 1992 election approached. Sheridan maintains he conveyed the seriousness of his financial condition to Burch and repeatedly pressed for the sale. Sheridan testified that, under the buy-sell provision, he could have acquired Burch's partnership interest and simultaneously conveyed the property to a third party purchaser, a "flip" in real estate jargon. Sheridan testified that the Grubb & Ellis proposal would have resulted in a 35% return on investment to Burch and substantial cash to both parties. Sheridan and Kinney maintain the parties ultimately decided to hold the properties until late 1992, both sides agreeing to forebear from exercising their respective buy-sell rights. Kinney testified that there was no "formal limitation," just an agreement not to sell the property. Sheridan testified that Burch provided additional incentive for Sheridan's forbearance by implying Burch would loan Sheridan sufficient funds to weather his financial crisis. (The alleged promise of a loan by Burch to Sheridan is discussed in the next section).

Burch testified there was no such agreement to hold the properties. Burch ultimately gave approval to proceed with the Grubb & Ellis proposal in July/August of 1990 (after a precipitous decline in the market). Burch indicated any such sale should not be consummated prior to August of 1991.

The plaintiffs have failed to show sufficient evidence of the existence of a forbearance agreement between the parties. Plaintiffs have failed to offer any documentary evidence of such an agreement, and the conduct of the parties indicates the absence of an agreement.

#### a. Burch's Consent Re: Grubb & Ellis

It is undisputed that no later than August 1990, Burch gave his consent for Sheridan to proceed with the Grubb & Ellis sales propos-

al. This occurred approximately two and one half months after the meeting where the plaintiffs maintain the parties allegedly agreed to hold the properties for *roughly two and one half more years.* This court doubts that two experienced businessmen would negotiate an agreement for an extensive holding period and then scrap it mere weeks later without some significant intervening event. Even if an agreement were made, as plaintiffs have claimed, Burch's agreement to the Grubb & Ellis proposal, and Sheridan's pursuit of the matter, indicate that, at minimum, any forbearance agreement was mutually abandoned late in August, 1990.

### b. *Negotiation for Amended Barnside Agreement*

The parties entered into an agreement of limited partnership for Barnside Apartment Associates Limited Partnership in May 29, 1990. The partnership contained the identical, unrestricted Section 7.1 pertaining to buy-sell rights. If the parties had just begun a two year forbearance agreement, it would be reasonable to include a reference to such an agreement in a new partnership's buy-sell provision. More probative, however, is the negotiations regarding an amended agreement for the partnership.

Kinney sent a memorandum to Burch requesting a revision to Section 7.1 to accommodate a potential third party investor. In the letter, Kinney acknowledged:

"As I understood it, your overriding consideration in any partnership agreement is your ability be to be bought out or have control in the event of a dispute."

(Trial Exhibit No. A–11.)

In the letter, Kinney inquired:

"Can you agree to not exercising the buy-sell unless there is a material unresolved disagreement between partners in accordance with their rights (Section 8.2) in the partnership agreement?"

(Trial Exhibit No. A–11.)

Burch agreed to a minor limitation. The amended and restated agreement for the lim-

ited partnership, which never became effective, provided in Section 7.1:

"*General.* Any Partner may at any time make an offer of purchase and sale of the entire partnership to any other Partner on the terms and conditions set forth herein, *provided, however, that BOMAT agrees that it will not make any such offer without good cause (as determined by BOMAT in its discretion) prior to September 1, 1991.*"

(Defendants' Exhibit 105) (emphasis added).

If the parties had agreed to a forbearance agreement which prevented sales until late 1992, it would not be necessary to negotiate a special exemption for the Barnside partnership. Further, Kinney's letter of September 4, 1990 expressly indicates his understanding that that Burch partner had the ability to invoke the buy-sell provision at anytime.

### c. *Creditor Memorandum*

Kinney and Sheridan's actions as regards third parties also cast doubt on the existence of a forbearance agreement. In a memorandum, dated February 1991, to Sheridan, Kinney opined that a debt acceleration by Sheridan's bank creditors could cause Burch to invoke the buy-sell provisions to protect Burch's interests.[4] (Defendants' Exhibit No. 174.) This document indicates that the plaintiffs were aware of the possibility of Burch using the buy-sells in early 1991—the middle of the alleged forbearance period—just a few weeks before Burch actually invoked the buy-sells.

### d. *Burch Memorandum*

The plaintiffs place great weight on a file memorandum prepared by Burch on July 25, 1990. The plaintiffs maintain that the memorandum provides full and conclusive documentation for their position:

"Although the timing is not the best, partly because of Sheridan's needs and partly because of my own desire to begin to unwind Sheridan, I have approved moving forward with the disposition package that Sheridan had previously requested provid-

---

4. Regarding the memorandum, Kinney testified that he did not believe Burch actually had such a right. He stated the reference to Burch was largely to "persuade" Sheridan creditors not to accelerate Sheridan's debts. Kinney testified that this was intended to encourage them to participate in a nonbankruptcy workout of Sheridan's debts.

ed that the sales are not consummated before August 9, 1991. (Apparently this will save us some prepayment penalties on the loans;) and ..."

(Plaintiffs' Exhibit No. 307, p. 1 ¶ (a).) Plaintiffs claim this passage confirms the existence of the agreement and indicates Burch could not, at minimum, invoke the buy-sell provisions before August 1991. When viewed in its entirety, however, the document is far less conclusive:

> "Notwithstanding Bob Sheridan and Bruce Kinney's initial unqualified acceptance of my August 1, 1991 request, I have to assume that we may come under later substantial pressures to sell sooner ..."

(Plaintiffs' Exhibit No. 307, p. 2.) This passage indicates, as Burch testified, that there was no agreement to hold property. On the contrary, the memorandum indicates Burch's concern that Sheridan would press for an earlier sale; that concern is inconsistent with the alleged forbearance agreement.

▪ The plaintiffs have failed to meet their burden in showing the existence of the forbearance agreement.[5] The parties' conduct, and the documents created during the relevant period, show an absence of any agreement to refrain from selling the property.[6]

### 2. Equitable Estoppel

▪ Plaintiffs contend that defendants are equitably estopped from exercising the buy-sell rights as to the eight Count III partnerships. Plaintiffs maintain that in May 1990 there was an excellent opportunity to sell certain properties on advantageous terms through Grubb & Ellis. Sheridan testified he was suffering financial difficulties at the time and desperately needed cash. Plaintiffs allege that Burch indicated that he would loan plaintiffs sufficient funds, secured by plaintiffs' equity in the partnerships, to weather plaintiffs' financial difficulties in exchange for plaintiffs' forbearance regarding the sale of the properties. Plaintiffs assert that had those properties been sold, all parties would have realized a substantial profit.

While loan negotiations went on for months during the summer of 1990, the loan was never made. Sheridan's inability to provide adequate security/collateral was the primary reason the loan negotiations failed. Plaintiffs argue that defendants are equitably estopped from exercising their buy-sell rights by their inequitable conduct regarding the loan to Sheridan.

▪ To establish a valid claim for equitable estoppel, plaintiffs must prove five elements: (1) defendants made misrepresentations which induced reliance; (2) defendants had knowledge that the representations were untrue; (3) defendants intended that the plaintiffs rely upon the alleged misrepresentations; (4) plaintiffs did, in fact, reasonably rely on the misrepresentations; and (5) plaintiffs would be prejudiced if the defendants are allowed to deny the contract. *Dresser Industries, Inc. v. Pyrrhus AG*, 936 F.2d 921, 930 (7th Cir.1991) (Illinois law).

The testimony of plaintiffs' own witnesses refutes the existence of the first element, a

---

5. In light of the holding as to the existence of a contract, the court need not address the statute of frauds issues raised by the defendants. The court does note that because plaintiffs' alleged oral forbearance agreement pertains to real estate, and could not be performed in less than one year (the alleged forbearance period ran for approximately 30 months—May 1990 to November 1992), such an agreement would likely have to be in writing to be enforceable. Ill.Rev.Stat. ch. 59, ¶¶ 1 and 2 (1988).

6. Even if the plaintiffs had succeeded in showing the existence of a forbearance agreement, it is highly unlikely the court could enforce it due to its indefiniteness, particularly as to its duration. Where a purported contract is indefinite as to a critical provision, it is strong evidence that the purported contract was never made. *Delcon*

*Group v. Northern Trust Corp.*, 187 Ill.App.3d 635, 135 Ill.Dec. 212, 217–221, 543 N.E.2d 595, 600–604 (1989). The plaintiffs presented several different proposed termination dates in their pleadings and testimony. Sheridan testified, alternatively, that the holding period was to last until the election (November 1992), or "closer" to the election in 1992 or simply 1992. Mr. Kinney testified they agreed not to sell the property (presumably with no expiration date). The termination date is obviously a critical provision in the alleged forbearance agreement. The court notes that even if the plaintiffs had proved the existence of the agreement, utilizing the most definite date (election day, November 3, 1992), the agreement would have expired before the last day of the trial (November 4, 1992).

misrepresentation that induced reliance. Both Sheridan and Kinney testified regarding conversations with Burch about a possible loan against Sheridan's equity in the partnerships. Both Sheridan and Kinney testified that Burch had *not* promised to make a loan, had not *agreed* to make a loan, and that *no* contract had been made to make a loan. Both men testified that Burch stated he would "favorably consider a request for a loan" based upon Sheridan's equity. The *strongest* statement attributed to Burch, some weeks after the "favorably consider" comment, was that Burch was "cautiously optimistic about making a loan."

"Cautiously optimistic" and "favorably consider" are not terms of commitment. These statements are clearly inadequate, especially when made to experienced business people represented by legal counsel, to create the reasonable reliance necessary for equitable estoppel.

## C. MANAGEMENT FEES

■ The defendants assert that the plaintiffs charged excess management fees to the partnerships. Defendants argue that the only fees plaintiffs were entitled to were those provided for in the respective management agreements, generally 3% of gross revenues for each partnership property.[7] Defendants assert that plaintiffs could not raise management fees without defendants' approval and that such approval was never given. Defendants maintain that the four $58,000 advances to the plaintiffs made in January, February, March and April of 1991 were *loans* that had to be repaid by the plaintiffs. Defendants seek to recover all management fees paid in excess of the percentages provided for in the management agreements.[8]

The plaintiffs respond to the defendants' claims with two theories:

1. that plaintiffs were entitled under the respective agreements to unilaterally raise their fees to meet their costs; and

2. Burch agreed to higher fees in a December 1990 meeting (and subsequent discussions).

Plaintiffs contend Burch's agreement to higher fees is indicated by the four $58,000 additional management fees approved by Burch in January, February, March and April of 1991. Plaintiffs assert the parties had agreed to an increased management fee to cover costs for the period subsequent to April 1991. The plaintiffs allege that the details of the agreement were to be formalized in amended management agreements when Mr. Burch returned from an extended vacation. Plaintiffs further assert the extra fees would be advanced from one partnership, which would be reimbursed by the other partnerships pro rata. Plaintiffs assert the advances were tentatively to be treated as loans until the agreements were amended.

Kinney testified that management fees had been reduced in the past year, in reflection of the reduced costs incurred by the plaintiffs. Kinney further testified that in the past year costs had been decreasing each month, due to increased efficiency, with a total reduction of $20,000 to $40,000 per month. Kinney also testified that, in most · months, costs, and consequently fees, *were below 3% of gross revenues.*

While the defendants have presented some evidence that the plaintiffs may have received management fees in excess of those for which the agreements provided, the plaintiffs have successfully refuted defendants' claim that plaintiffs received excess management fees.[9]

---

7. Three of the partnerships provided for somewhat different percentages; W 65 Bedford Park Associates, Newtown Associates Limited Partnership, and Barnside Apartment Associates Limited Partnership. The differences, however, are not relevant to this court's analysis.

8. Testimony established that there is no current written management agreement for the Barnside limited partnership. Burch testified that management services were provided by the plaintiffs pursuant to an oral agreement. The terms of

that oral agreement were not specified in the testimony. For purposes of this opinion, this court will presume the oral agreement is substantially similar in its terms to the written management agreements for the other partnerships.

9. Even if the defendants had shown the plaintiffs had charged excess fees, it is unlikely the court would be able to award damages. Both sides were extremely effective in discrediting the calculations of their opponents regarding fees paid versus fees that should have been paid. It would

As before, this court's analysis focuses on the agreements and conduct of the parties.

### 1. Contract Provisions and Correspondence

Section 7 of the Master Agreement provides:

> Promptly after the formation thereof pursuant to the provisions of this Agreement, each Investment Partnership shall enter into a management agreement (a "Management Agreement") between each such investment Partnership, as owner, and Sheridan (or its affiliate or designee), as managing agent in the form annexed hereto as Exhibit D and made a part hereof, pursuant to the terms of which Sheridan (or its approved affiliate) shall manage and operate each Approved Property on behalf of the acquiring Investment Partnership. Sheridan (or its approved affiliate or approved designee), as the managing agent, shall be entitled to receive a management fee (the "Management Fee") in an amount which the parties contemplate shall approximate its costs in managing the property. *Except as the parties may from time to time agree in order to better coordinate the fee with Sheridan's costs, responsibilities and/or the results achieved, the fee shall be equal to three (3%) percent of the annual collected gross income from each .Approved Property.*

(Joint Trial Exhibit No. 1) (emphasis added.)

This provision of the Master Agreement is reflected in the Management Agreements. The form Management Agreement dealt with agent compensation in Section 3:

### 3. AGENT'S COMPENSATION.

> A. *Owner shall pay Agent an annual management fee equal to three percent (3%) of the gross income and collections from the Property from all sources during each year of the term hereof* (as appropriately prorated for any partial year and computed on an accrual basis), including, but not limited to, rents, additional rents, alteration charges, parking fees and all other charges and payments due to Owner

from any tenant, licensees, concessionaires or other occupants or users of any space at the Property.

(Joint Trial Exhibit No. 1, Exhibit D) (emphasis added.) This provision supports the position, testified to by both sides, that the management fees were intended to cover the plaintiffs' costs. The language "as the parties may from time to time agree," however, indicates that changes in the management fees to cover costs could only be made by agreement of the parties, *not unilaterally.*

Section 7 of the Master Agreement was amended to include an additional provision:

> *The Management Fees as set forth above shall from time to time be increased by such amounts as Sheridan from time to time determines is necessary to cover its costs* provided that the total cumulative increases in the Management Fees for any property shall not exceed an amount equal to the Acquisition Fee for said property.

(Joint Trial Exhibit No. 2) (emphasis added.) This provision indicates that Management Fees were to be regularly reviewed and increased. Plaintiffs assert this addition indicates a unilateral right to increase fees to cover costs. However, the amended provision includes, in its entirety, the same provision in the earlier agreement, including the language "as the parties may from time to time agree."

The form limited partnership agreement contained the following provision, Section 6.2, regarding "Compensation for the General Partner":

> The General Partner shall be entitled to an acquisition fee, management fees and leasing commissions as set forth in the Business Plan and Budget and the Management Agreement, but shall not otherwise be entitled to compensation for its services. *The General Partner shall be entitled to reimbursement from the Partnership for all ordinary and necessary out-of-pocket costs incurred directly in connection with the business of the Partnership,* but specifically excluding compensation of officers or

---

be difficult for the court to use either side's numbers, or a combination of each side's numbers, to arrive at a credible calculation from

which any damages could be determined on this issue.

employees of the General Partner or any Affiliate of the General Partner or for overhead expenses of the General Partner or any Affiliate of the General Partner.

(Joint Trial Exhibit No. 1, Exhibit B) (emphasis added.) This provision again indicates the plaintiffs' right to recover costs, but it is silent on the issue as to the plaintiffs' unilateral right to do so.

The form limited partnership agreement provided certain rights to the limited partner regarding amendments to the agreement. Rights of approval were provided to the limited partner in Section 8.2(7):

Any transaction of the Partnership (including any amendment or any existing transaction) in which the General Partner or any Affiliate of a General Partner has an actual or potential conflict of interest with the Partnership or the Limited Partner *and any amendment to or cancellation of the Management Agreement other than those necessary to make the Management Agreement consistent with the Business Plan and Budget then in effect.*

(Joint Trial Exhibit No. 1, Exhibit B) (emphasis added.) This provision supports the defendants' contention that the plaintiffs could not unilaterally raise the management fees.

Considerable correspondence is relevant to this issue.

1. In a letter from Burch to Sheridan, dated September 26, 1989, Burch explained

—that "fee compensation should never become a profit center";

—that Sheridan's performance was sufficiently outstanding as to "warrant an increase in compensation payable for such projects";

—that if fees ever exceed costs, "fees will be reduced."

(Defendants' Exhibit No. 142.) This letter is very significant. It indicates that management fee increases were in the offing. It also indicates the defendants may have believed they could reduce fees as a matter of right if the fees exceeded costs. The plaintiffs have claimed a reciprocal right. When asked about the letter on cross-examination, Burch testified that he had no unilateral

right to reduce fees, just that he *may wish to.*

2. A memo from Kinney to Burch, dated December 17, 1990, provided:

"We are authorized to debit RS & P/Bing partnership to *cover asset management expenses* for month of January, 1991 per the 12/11/90 Asset Management Fee Schedule. *The characterization of these expenses will be discussed when we meet next year* to discuss our overall relationship going forward."

(Defendants' Exhibit No. 151) (emphasis added.) This letter supports the plaintiffs' position that the $58,000 advances were additional management fees agreed to by Burch. The "characterization" language supports the plaintiffs' position that the precise mechanics and documentation were to be worked out on Burch's return.

3. In a letter from Burch to Kinney, dated December 18, 1990, Burch stated the following regarding asset management expenses:

"... my understanding of the discussion was *that I will consider asset management expenses on their merits* ... [while acknowledging they may not be soon resolved] ... I would be willing to cause a Bing entity to advance the $58,000 for January and $58,000 for February *as a loan until the overall picture can be worked out.*"

(Defendants' Exhibit No. 152) (emphasis added.) This letter supports the defendants' position that there was no agreement and the advances were loans. The response letter from the plaintiffs, however, makes these contentions unpersuasive.

4. In a letter from Sheridan to Burch, dated January 23, 1992, Sheridan stated:

"Regarding asset management fees for January and February, *until we sort things out,* I understand that you would *like to see it as a loan.* I would like to modify your idea and suggest that *25% come from Melrose and 75% come from Barnside.*"

(Defendants' Exhibit No. 154) (emphasis added.) This letter supports the plaintiffs' posi-

tion, particularly in the manner it responds to Burch's letter. Notably, the loan language reflects a very different view than that asserted by the defendants at trial. The defendants claim the loan was from the partnership to the general partners (Sheridan entities), and it had to be repaid to the partnerships by the general partners. The plaintiffs argue the "loan," which they argue was a "loan" in name only, was from one partnership and to be paid pro rata by the other partnerships, a de facto fee increase to the general partners. The letter from Sheridan clearly expresses this second view—the loan in this case *coming* from two partnerships rather than óne "donor partnership;" presumably both to be repaid pro rata by the other partnerships. As Burch and Sheridan both testified, Sheridan had repeatedly sought a higher management fees. It would be incongruous with Sheridan's position to so cheerfully accept a loan he would have to repay.

5. In a letter from Burch to Kinney, dated March 20, 1991, Burch stated the following regarding the payments:

"Payment of the *March management fee* from 2100 Corp. Drive Associates is acceptable."

(Plaintiffs' Exhibit No. 308) (emphasis added.) This letter is extremely probative. First, Burch characterizes the March payment as a "management fee," not *an advance* and not *a loan*. On cross-examination, Burch stated that it was a case of "sloppy language" on his part. It seems unlikely, however, that a careful person, as Burch appears to be, would make such a blatant error. The alleged error seems especially unlikely in light of the fact this litigation, which was filed the following month, was likely anticipated when Burch sent the letter. The post-litigation correspondence was extremely precise. Second, the letter provides that the payments come from a specified partnership. This supports the plaintiffs' contention that the management fee would be paid by one partnership and reimbursed pro rata by the other partnerships.

Other correspondence arose after the onset of litigation. Most of the correspondence after the onset of litigation is not very proba-

tive; both parties seem to be engaging in posturing for litigation.

1. In a letter to Burch from Sheridan, dated May 21, 1992, Sheridan stated:

"As we have agreed in months past, we intend to continue paying an asset management fee of $58,000 to Bridgewood each month. The asset management fee will be included as a separate item on future budgets."

(Defendants' Exhibit No. 163.)

2. Burch responded to Sheridan, in a letter dated May 29, 1992, asserting that Sheridan was only entitled to the compensation provided for in the management agreements and that Sheridan had no authorization to receive other fees. (Defendants' Exhibit No. 164.)

3. In a letter to Burch, dated June 6, 1991, Sheridan expressed the following views:

a. the four advance payments were to be treated as loans only until Burch returned from his trip and the parties could formally revised the management agreements;

b. Burch had approved the extra payments for January, February and March;

c. that if Bridgewood did not receive the extra fees, Bridgewood would be unable to cover costs and would have no choice but to contract the management services to outside professionals and pass the costs on to the partnerships.

(Trial Exhibit A, No. 23.)

4. Burch sent a reply to Sheridan on June 13, 1991, asserting:

a. the additional asset management fees were neither approved nor appropriate;

b. Sheridan was only entitled to amounts provided for in management agreements;

c. Sheridan had breached his fiduciary duties to the partnerships.

(Defendants' Exhibit No. 165.)

5. Sheridan responded to Burch in a letter, dated June 26, 1991, where he emphasized that Burch had approved the extra fees in the past and now was denying it as a

litigation ploy. (Defendants' Exhibit No. 166.)

6. Kinney sent a memo to Sheridan, dated July 19, 1992, which discussed the operating budget for the partnerships and set the management fee at "4% of aggregate gross receipts." (Defendants' Exhibit No. 167.) The defendants attribute considerable weight to the memorandum prepared by Kinney. Burch has repeatedly testified that he did not agree to an increase in management fees to 4% of gross revenues. Sheridan has testified that while Burch never formally agreed to a 4% figure, the $58,000 payments affected the actual percentage received and the understanding as to cost reimbursement did not reflect a percentage.

The financial statements of the partnerships provide insight as to the nature of the advances. The advances were accounted for in the audited financial statements as *loans,* but the financial statement notes provided a more detailed explanation:

*Note 2*

*Management Fees*

The Partnership entered an agreement with an affiliate of the general partner for property management services. According to the terms of the agreement, the Partnership pays a management fee equal to 3% of all rents collected less amounts paid to a third party management company equal to at least $600 monthly or 2.5% of rents collected on a monthly basis. This agreement coincides with the leasing agreement as to expiration and termination. During the current year, the Partnership incurred and paid $3,293 of management fees to the affiliate.

During the current year, the Partnership entered into an agreement with an affiliate of the general partner to modify the management agreement fee structure and manager. Under this agreement the Partnership is required to pay an additional management fee equal to its pro rata share of a set amount based on monthly cash collections of the Partnership and fifteen other partnerships affiliated with the partners.

(Defendants' Exhibit No. 246—Audited Financial Statements for 32500 Capital Avenue Associates Limited Partnership—dated July 31, 1991 and July 31, 1990.) The fact the $58,000 payments are recorded as loans in the audited financial statements supports the defendants' position. However, the accompanying note, particularly the second paragraph, support the plaintiffs' position. The reference to a pro rata payment by the partnership, and its fifteen affiliates, support the plaintiffs' position that the "loans" were really de facto management fee increases.

### 2. *Unilateral Right Theory*

The plaintiffs first theory, that they were entitled to unilaterally raise management fees to cover costs, is not persuasive. The Master Agreement clearly and unambiguously provides that any increase in management fees must be by agreement of both parties. Both the original and amended forms of Section 7 of the Master Agreement provide that fee increases must be by agreement of the parties. Further, Section 8.2(7) of the limited partnership agreements specifically grant a right of approval to the limited partner for "any amendment to or cancellation of the Management Agreement."

The plaintiffs assign great weight to Burch's letter of September 26, 1989, which stated that if fees ever exceed costs, "fees will be reduced." (Defendants' Exhibit No. 142.) Plaintiffs argue that if the limited partners had the unilateral right to reduce fees to match costs, the general partners had a reciprocal right to raise fees to match costs. However, Burch testified that he had no right to reduce fees, just wished to do so. Further, there is no evidence the defendants, prelitigation, attempted to reduce fees as a matter of right. The plaintiffs have not presented any evidence that overcomes the explicit language of the agreements requiring that any changes in the fees must be by agreement.

### 3. *Existence of an Agreement*

The plaintiffs have shown the existence of an agreement to increase fees. The relevant prelitigation correspondence, notes to the audited financial statements, and the bulk of the testimony clearly indicate an accord had been reached to increase fees. The onset of

litigation prevented the agreement from being reduced to a writing, but the defendants had agreed to an increase in fees.

As discussed, the parties' agreements provided that the general partner would recover costs via the management fees and the management fees would be adjusted as needed. Burch's letter of September 26, 1989 confirms that fee increases were both envisioned and took place. (Defendants' Exhibit No. 142.) The correspondence between the parties during the relevant period, from Kinney's memorandum of December 17, 1990 (Defendants' Exhibit No. 151), through Burch's letter of March 20, 1991 (Plaintiffs' Exhibit No. 308), when read together, all point to a similar conclusion. In response to Sheridan's repeated requests for higher fees, the parties had agreed to increase the partnerships' management fees. The fees would be paid by one partnership, the payment being treated as a loan to, and repaid pro rata by, the other partnership.

The defendants have failed to prove that the plaintiffs have charged excess management fees.

### D. ACCOUNTING FEES

The defendants also have presented a claim against the plaintiffs for accounting fees. The defendants contend that the plaintiffs improperly charged accounting fees to the partnerships in clear violation of the relevant agreements. Defendants assert that plaintiffs were required to absorb accounting fees under the Management Agreements and be reimbursed only as permitted under the Management Agreements. In the alternative, the defendants allege that even if the plaintiffs were permitted to pass on accounting fees attributable to "outside" accounting firms to the partnerships, plaintiffs improperly charged the partnerships in this case because the accountants were in-house Sheridan employees.

This issue focuses on Sheridan's accountant, Tassi, and his staff. Prior to August 1990, Tassi was an employee of Edgemont. In this capacity, Tassi did a great deal of work for the partnerships, including the preparation of monthly financial statements, accounts payable, accounts receivable, bank reconciliations, budget schedules, cash flow projections, cash management statements, tax returns, and calculations of preferred return. Tassi and staff also coordinated the annual audit with outside accounting firms. The cost of Tassi's services was absorbed by the Sheridan entities.

In August 1990, Tassi founded KTP Corporation ("KTP"). Tassi is the principal shareholder. KTP performed the same services for the partnerships that Tassi had as Sheridan's employee. KTP has done work for 26 Sheridan partnerships, sixteen of which are the Sheridan/Burch partnerships that are the subject of this action. Tassi testified that a full 80% of KTP's revenue came from Sheridan entities. KTP's office is in the same building as the Sheridan entities, and KTP pays rent of $1,600 a month to a Sheridan entity. Bridgewood paid KTP fees for services to the partnerships that were classified as "clerical or bookkeeping", while KTP's fees relating to accounting services were passed on to the partnerships. Sheridan argues that neither he, nor any of his affiliates, has any financial or management interest in KTP.

The total fees paid are in dispute. Apparently, KTP received approximately $80,000 a month in fees for 1991 (approximately 42% attributable to the Sheridan/Burch partnerships); $55,000 a month for 1992 (approximately 38% attributable to the Sheridan/Burch partnerships). The fees and percentages for 1990 were not presented.

There is some dispute as to when Burch was informed of the change in policy regarding accounting fees and KTP. At the latest, Burch learned of the changes approximately five months after the fact. Sheridan, while testifying that he did not specifically remember when he informed Burch of the changes, testified that it may have been sooner, given the dozens of business calls the parties exchanged in the interim period. Burch further testified *he was aware* Sheridan was initially providing accounting services to the partnerships at Sheridan's expense. Burch also testified that Sheridan informed him that Sheridan was no longer financially capable of providing accounting services.

The defendants contend that plaintiffs were not entitled to charge KTP's fees to the partnerships. Defendants argue that the accounting services were required to be provided by the plaintiffs under the Management Agreements, with the only compensation owed to the plaintiffs being the management fees (generally 3% of gross rents for the given partnership property). Defendants also argue that KTP is really an in-house entity, and even if plaintiffs could charge the partnerships for outside accounting services, KTP does not qualify as an "outside" firm.

### 1. Charging Accounting Fees

There are several provisions of the respective agreements that are relevant to our analysis.

Section 7 of the Master Agreement, titled "Management Agreement", provides in relevant portion:

> ... Sheridan (or its approved affiliate or approved designee), as the managing agent, shall be entitled to receive a management fee (the "Management Fee") in an amount which the parties *contemplate shall approximate its costs in managing the property*. Except as the parties may from time to time agree in order to better coordinate the fee with Sheridan's costs, responsibilities and/or results achieved, the fee shall be equal to three (3%) percent of the annual collected gross income from each Approved Property.

(Joint Trial Exhibit No. 1) (emphasis added.) [10]

The Master Agreement was modified by the parties on July 31, 1988, with Section 7 "Management Agreement" now providing:

> *The Management Fees as set forth above shall from time to time be increase by such amounts as Sheridan form time to time determines is necessary to cover its costs* provided that the total cumulative increases in the Management Fees for any property shall not exceed an amount equal to the Acquisition Fee for said property.

(Joint Trial Exhibit No. 2) (emphasis added.) As discussed in the previous section of this

opinion, the provisions indicate the plaintiffs are entitled to recover the costs of managing the properties.

The form Management Agreement provides for compensation in Section 3A, "Agent's Compensation":

> *Owner shall pay Agent an annual management fee equal to three percent (3%) of the gross income and collections from the Property from all sources during each year of the term hereof* (as appropriately prorated for any partial year and computed on an accrual basis), including, but not limited to, rents, additional rents, alteration charges, parking fees and all other charges and payments due to Owner from any tenant, licensees, concessionaires or other occupants or users of any space at the Property.

(Joint Trial Exhibit No. 1, Exhibit D) (emphasis added.) The defendants maintain that these provisions definitively cover the compensation due to the plaintiffs for managing the properties, including providing accounting services.

The form Management Agreement also provides in Section 4.A(h) and (1) that the agent shall perform the following duties:

> (h) As agent for Owner, hire, pay, direct, supervise and *discharge all operating and service employees (and service contractors, space planners and property tax or other consultants) performing services in or about or for the Property,* including specifically, but not limited to, the property manager, the superintendent and any security personnel; all such employees at the Property shall be employees of Owner, and Agent shall not be liable to Owner or any third party for the acts or omissions of such employees; *Owner shall pay for the wages or compensation of such employees and for the fees of such contractors, consultants and planners* as part of the cost of operating the Property; Agent shall, in the hiring of such employees, contractors and consultants, use reasonable care to select qualified, competent and trustworthy employees, contractors and consul-

---

**10.** There is some variation as to the applicable percentage designated for the management fee. As before, none of these variations is relevant to this court's analysis.

tants; Agent, as agent for Owner, shall negotiate (in conjunction with other owner-representatives and in accordance with practice in the metropolitan area) with any labor union lawfully entitled to represent building employees and will enter into collective bargaining agreements or other labor contracts no less advantageous to Owner than contracts which shall be standard for buildings of similar character in the area;

(emphasis added) and

(1) Provide, at Owner's expense with respect to employees at the Property and at Agent's expense with respect to employees in Agent's regional or main offices, *all bookkeeping and clerical services, including the maintenance of payroll records, and the services of such leasing, managing, supervising and bookkeeping personnel,* including without limiting the generality of the foregoing, Agent's executive personnel, and such other incidental services, an may be necessary to carry out the purposes of this Agreement; to the extent that only part-time services at or for the Property are required from any of the foregoing employees or personnel for the performance of the aforesaid functions and services, their salaries shall be appropriately prorated for such part of their time as may be spent at or for the Property.

(Joint Trial Exhibit No. 1, Exhibit D) (emphasis added).

It is clear from these provisions that the parties fully intended that the plaintiffs would be permitted to hire outside professionals, at partnership expense, to perform a variety of functions. Burch repeatedly conceded that Sheridan was not required to pay for the annual audit. Burch testified that audit expenses were *properly chargeable* to the partnerships. However, the parties agree that the plaintiffs were required to provide "bookkeeping and clerical" services to the partnerships at plaintiffs' expense. The dispute crystallizes into the issue of whether general accounting-type services provided by KTP are more like the services performed by outside professionals at partnership expense, such as the annual audit, or more like the bookkeeping and clerical ser-

vices the general partners are required to provide at their own expense.

The defendants aggressively argue that Tassi/KTP's services are clearly bookkeeping or clerical in nature. Burch's testimony is more equivocal. When asked if the parties' agreements allowed Sheridan to charge no-naudit accounting charges to the partnerships, Burch testified he believed the agreements were "ambiguous" on the point. Burch testified that while he disagreed with the practice, *he acquiesced to it.*

Further, the more recent partnership agreements contained a revised provision regarding the financial statements that were to be prepared for the parties:

*10.7 Quarterly and Interim Reports.*

(d) Such other reports and financial statements as the Limited Partners may request by giving Notice to the General Partner, *provided that the cost of preparing same shall be borne by the Partnership and shall be a Partnership expense.* Provided that if and to the extent such statements are needed for special requirements of a Limited Partner rather than to provide it *with information that it could reasonably expect to receive to keep it as to the business activities of the Partnership,* and the cost of such special requirements information *is moderate in relation to what would normally be expected to be furnished as a Partnership expense,* such excess costs shall be reimbursed to the Partnership by said Limited Partner . . .

(Defense Exhibit 302—Restated Agreement of Limited Partnership of RS & P/West Chicago II Limited Partnership dated January 1, 1990) (emphasis added).) This provision seems to have been drafted to resolve an unexpected situation—how to charge fees attributable to unusual requests for additional financial statements. In such situations, the fees are chargeable *to the limited partner.* This provision indicates that normally the preparation of financial statements, which can be best classified as an accounting task, *was generally a cost of the partnership.* The tasks performed by KTP, such a preparing schedules of accounts payable and receivable, cash flow projections, and related business management and financial summaries, are

clearly analogous to the services covered in Section 10.7.

That accounting fees attributable to preparing financial statements are chargeable to the partnerships, coupled with the provisions allowing the general partner to engage outside professionals, including the accountants that conduct the annual audit, at partnership expense, in conjunction with Burch's acquiescence to Sheridan's practice, lead to the conclusion that accounting fees are chargeable to the partnerships.

### 2. KTP as a Sheridan Affiliate.

 The defendants also argue that even if the plaintiffs were entitled to charge the services of outside accountants to the partnerships, the plaintiffs could not charge KTP's fees because KTP was a Sheridan entity.

To support their arguments, the defendants place great weight on the drafts of a memorandum prepared by Tassi. One draft of the memorandum, dated December 17, 1990, from Tassi to Kinney and Sheridan contained the following passage:

> "When KTP was formed I made a commitment of excellence to you. Now that the accounting department is a 'profit center', I am able to make the appropriate investments in people and equipment to better fulfill this promise."

(Defendants' Exhibit No. 173.)

A second version of the document, with the same date and the same parties, was substantially identical except for the deletion of the words "accounting department" and "profit center". (Defendants' Exhibit No. 174.)

The draft memorandum is not conclusive. Tassi testified that he could not recall the error or who corrected it. As Tassi served as the head of Sheridan's accounting staff for a number of years before forming KTP, it is not surprising that he might make an error on his first report as head of KTP. Further, it is also possible KTP as an entity has multiple departments (audit, tax, accounting, etc.)

Far more significant is the fact that the defendants have presented *no* evidence that:

a. Sheridan or a Sheridan entity has any financial interest in KTP;

b. KTP has any preferential arrangement with any Sheridan entity for fees;

c. Sheridan or a Sheridan entity has any control over KTP.

Defendants have presented no evidence to indicate that KTP is anything but an independent corporate entity. Defendants' claim on this point is rejected.

### E. THE ACCOUNTING

In light of this court's decision on the management fee issue and the accounting fee issue, the defendants' request for an accounting is denied.

### F. TERMINATING THE PARTNERSHIPS

In light of this court's decision on the calculation of the buy-sells, and the freedom of the defendants to invoke them at will, the defendants can clearly severe their partnerships with the plaintiffs at their pleasure. As the parties' agreement also allows the purchasing partner to cancel the relevant management agreements, the defendants are free to severe all ties to all the Sheridan entities.

## III. CONCLUSION

For the reasons discussed above, and based upon the parties' agreement distilling all alleged claims into the four issues addressed at trial, judgment is entered in favor of defendants and against the plaintiffs on Count I and Count III of plaintiffs' complaint, and judgment is entered in favor of the plaintiffs and against the defendants on the management fee issue and the accounting fee issue. Pursuant to the parties' agreement all other claims and issues raised by the parties are moot. Each side to bear its own costs.